**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

THE PIZZA STANDARD LLC, on behalf of itself and those similarly situated,

Plaintiff,

v.

VISA INC.; VISA U.S.A. INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED; MASTERCARD INTERNATIONAL INCORPORATED; BANK OF AMERICA, N.A.; BANK OF AMERICA CORPORATION; CAPITAL ONE BANK (USA), N.A.; CAPITAL ONE FINANCIAL CORPORATION; CHASE BANK USA, N.A.; CITIBANK, N.A.; CITIGROUP, INC.; JPMORGAN CHASE & CO.; PAYMENTECH, LLC; and WELLS FARGO & COMPANY,

Defendants.

Case No. _______

**CLASS ACTION COMPLAINT**

Jury Trial Demanded

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. THE PARTIES ..... 4

III. JURISDICTION AND VENUE ..... 6

IV. FACTUAL BACKGROUND ..... 7

A. The Visa and Mastercard Networks ..... 7

B. The Structure of a Credit Card Transaction ..... 15

C. Visa and Mastercard's Mandatory Merchant Rules Prevent Competition on Interchange and Network Fees ..... 21

(1) No-Surcharge Rules ..... 21

(2) Honor-All-Cards Rules ..... 24

(3) No-Discount Rules ..... 25

(4) No-Bypass Rules ..... 26

(5) No-Competing-Marks Rules ..... 26

(6) All-Outlets Rules ..... 26

(7) The Challenged Restraints as a Whole Prevent Competition on Interchange and Network Fees ..... 27

D. Neither the MDL 1720 Damages Settlement nor the Proposed Equitable Settlement Provides Relief to Plaintiff or the Proposed Class for their Ongoing, Present-Day Overcharges ..... 28

E. The Challenged Restraints Harm Competition ..... 30

F. Experiences From Outside of the United States Demonstrate That Defendants' Practices Are Anticompetitive ..... 34

G. Merchants Are Direct Purchasers of Card Processing Services and Directly Pay Interchange and Network Fees ..... 38

V. RELEVANT MARKET ..... 42

A. The United States Is a Relevant Geographic Market ..... 42

B. General Purpose Credit Card Network Services Are a Relevant Product Market ..... 42

VI. MARKET POWER ..... 45

VII. PLAINTIFF AND THE CLASS HAVE BEEN INJURED BY DEFENDANTS' CONDUCT ..... 46

VIII. CLASS ACTION ALLEGATIONS ..... 48

IX. CAUSES OF ACTION ..... 51

COUNT I ..... 51

COUNT II ..... 53

COUNT III ... 56
COUNT IV ... 57
VIOLATIONS OF STATE ANTITRUST LAWS ... 59
COUNT V ... 59
COUNT VI ... 60
COUNT VII ... 61
COUNT VIII ... 62
COUNT IX ... 63
COUNT X ... 64
COUNT XI ... 64
COUNT XII ... 65
COUNT XIII ... 66
COUNT XIV ... 67
COUNT XV ... 68
COUNT XVI ... 68
COUNT XVII ... 69
COUNT XVIII ... 70
COUNT XIX ... 70
COUNT XX ... 71
COUNT XXI ... 72
COUNT XXII ... 73
COUNT XXIII ... 73
COUNT XXIV ... 74
COUNT XXV ... 75
COUNT XXVI ... 75
COUNT XXVII ... 76
COUNT XXVIII ... 77
COUNT XXIX ... 78
COUNT XXX ... 79
COUNT XXXI ... 79
COUNT XXXII ... 80
COUNT XXXIII ... 81
COUNT XXXIV ... 82
COUNT XXXV ... 84
COUNT XXXVI ... 84
COUNT XXXVII ... 85

COUNT XXXVIII ........ 86
COUNT XXXIX ........ 87
COUNT XL ........ 88
COUNT XLI ........ 88
COUNT XLII ........ 89
COUNT XLIII ........ 90
COUNT XLIV ........ 90
COUNT XLV ........ 91
COUNT XLVI ........ 92
COUNT XLVII ........ 93
COUNT XLVIII ........ 93
COUNT XLIX ........ 94
COUNT L ........ 95
COUNT LI ........ 96
COUNT LII ........ 96
COUNT LIII ........ 97
COUNT LIV ........ 98
COUNT LV ........ 99
COUNT LVI ........ 100
COUNT LVII ........ 101
COUNT LVIII ........ 101
COUNT LIX ........ 102
COUNT LX ........ 103
COUNT LXI ........ 105
COUNT LXII ........ 105
COUNT LXIII ........ 106
COUNT LXIV ........ 107
COUNT LXV ........ 108
COUNT LXVI ........ 109
VIOLATIONS OF STATE CONSUMER PROTECTION LAWS ........ 110
COUNT LXVII ........ 111
COUNT LXVIII ........ 111
COUNT LXIX ........ 112
COUNT LXX ........ 114
COUNT LXXI ........ 115
COUNT LXXII ........ 116

COUNT LXXIII .......... 117
COUNT LXXIV .......... 118
COUNT LXXV .......... 119
COUNT LXXVI .......... 119
COUNT LXXVII .......... 120
COUNT LXXVIII .......... 121
COUNT LXXIX .......... 122
COUNT LXXX .......... 123
COUNT LXXXI .......... 124
COUNT LXXXII .......... 124
COUNT LXXXIII .......... 125
COUNT LXXXIV .......... 126

X. PETITION FOR RELIEF .......... 127

1. Plaintiff The Pizza Standard LLC, on behalf of itself and the Class defined below, brings this action under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3), Section 4 of the Clayton Act (15 U.S.C. § 15), and the various state laws alleged herein, against Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association ("Visa"); Mastercard Incorporated and Mastercard International Incorporated ("Mastercard"); and the bank-affiliated Defendants listed in this Complaint (the "Bank Defendants") (collectively, "Defendants"), for the injuries sustained by Plaintiff and other members of the Class from Defendants' anticompetitive conduct in the market for general purpose credit card network services in the United States (the "Relevant Market") described herein.

## I. INTRODUCTION

2. This case challenges a massive, ongoing conspiracy between Visa, Mastercard, and the nation's largest banks to artificially inflate the fees that merchants pay on every credit card transaction. Through collectively set and effectively non-negotiable fees, Visa, Mastercard, and the Bank Defendants impose a deadweight toll on virtually every credit card purchase in America, extracting hundreds of billions of dollars in monopoly rents from merchants through a collective exercise of market power. That conduct has been litigated, but it has not stopped. Merchants continue to pay supracompetitive fees to accept Defendants' cards today, at rates that no competitive market would produce.

3. Since the 1960s, Visa and Mastercard have worked with their Member Banks, including the Bank Defendants, to set uniform schedules of so-called "interchange fees"—effectively non-negotiable charges that merchants must pay to credit card issuing banks on each transaction. To preserve their elevated interchange fee levels and ensure merchants cannot escape them, Defendants enacted a web of anticompetitive rules (the "Challenged Restraints"). Through "Honor-All-Cards" rules, merchants that accept any Visa or Mastercard credit card must accept all such cards, regardless of cost, eliminating any incentive for issuing banks to compete by lowering their fees. Through "No-Surcharge" and "No-Discount" rules, Visa and Mastercard have prevented merchants from using the price mechanism to steer customers to lower-cost payment options.

These interlocking restraints disable the competitive market forces that would otherwise discipline interchange fees, allowing Defendants to raise their fees year after year without consequence.

4. Visa and Mastercard further exploit the Challenged Restraints to artificially inflate their own "network fees" that they charge to each merchant as a cost of accepting their cards. These network fees—which comprise a combination of per-transaction fees and fixed fees—add an additional supracompetitive tax on each credit card transaction, and the Challenged Restraints prevent merchants from steering customers to lower-cost options and thus stimulating competition among networks to lower network fees.

5. The scale of this ongoing scheme is staggering: merchants now pay over $100 billion annually in fees to accept Visa and Mastercard credit cards, enriching Defendants at merchants' expense.

6. Merchants have fought for decades to end this anticompetitive scheme. In 2005, merchants and their trade associations filed lawsuits challenging Defendants' conduct, which were consolidated in the Eastern District of New York. *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720 (E.D.N.Y.) ("MDL 1720").

7. In December 2019, the Court approved a damages settlement that provided over $5 billion in monetary relief to merchants (the "Damages Settlement")—but only for harm suffered during the class period, which ended on January 24, 2019.

8. A separate equitable relief class action seeking injunctive relief remains ongoing, with a proposed amended settlement currently pending before the Court (the "Equitable Settlement"). But even if approved—and even if its proposed changes to the Challenged Restraints ultimately lessen Defendants' supracompetitive fees—that settlement will apply only prospectively, and will not provide a single dollar in compensation to merchants for the fees they have paid since January 25, 2019.

9. In short: some merchants obtained relief for pre-2019 purchases, some may eventually benefit from prospective rule changes, but merchants accepting cards after January 2019 are left with zero recompense for their injuries suffered since then. Yet these merchants have

borne the full brunt of Defendants' continuing anticompetitive conduct—the very same unlawful restraints that caused Defendants to settle the damages class action for over $5 billion. This settlement structure leaves millions of American merchants without any remedy for their ongoing injuries.

10. The anticompetitive conduct alleged herein, including the use of the Challenged Restraints to impose and maintain supracompetitive merchant fees, has continued uninterrupted since the Damages Settlement and throughout the Class Period. Each credit card transaction processed under those rules inflicts a new and independent antitrust injury on Plaintiff and members of the Class. Moreover, Defendants have continued to update, ratify, and enforce the Network Rules, including the Challenged Restraints, throughout the Class Period.

11. This Court approved a damages settlement in MDL 1720 that provided compensation for members of that settlement class who accepted card payments on or before January 24, 2019. But there are millions of merchants that began accepting cards only after January 24, 2019. These merchants received *no* relief in the Damages Settlement, are not parties to that settlement, and have not even arguably released their claims arising from Defendants' unlawful conduct. Plaintiff The Pizza Standard LLC first accepted credit cards after January 24, 2019, and is a member of this second group.

12. Merchants like The Pizza Standard LLC face continued, uncompensated overcharges by Defendants, day after day. They face these overcharges, moreover, due to the very same Challenged Restraints that led Defendants to settle the MDL 1720 damages class for over $5 billion, and which Defendants have agreed to change prospectively pursuant to the Equitable Settlement. Even assuming the Equitable Settlement will eventually lessen the effects of these anticompetitive restraints, Defendants today face no consequences whatsoever for their continued unlawful conduct—and Plaintiff bears the continued brunt of their inflated fees.

13. Plaintiff brings this action on behalf of merchants that have accepted Visa and/or Mastercard credit cards in the United States from January 25, 2019 through the present whose claims have not been lawfully released. They seek damages for the supracompetitive fees they

have paid and continue to pay as a result of Defendants' ongoing, unlawful restraints that have insulated Defendants' price-fixing scheme from competitive forces for over half a century.

## II. THE PARTIES

14. Plaintiff The Pizza Standard LLC is a California limited-liability company with its principal place of business in San Diego, California. It has accepted Visa and Mastercard credit cards since 2021. The Pizza Standard did not accept Visa or Mastercard payment cards before January 25, 2019, and did not release any claims in the Damages Settlement.

15. Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendants Visa U.S.A. Inc. and Visa International Service Association are Delaware corporations and direct or indirect subsidiaries of Visa Inc.

16. Defendant Mastercard Incorporated is a Delaware corporation with its principal place of business in Purchase, New York. Defendant Mastercard International Incorporated is a Delaware corporation and the principal operating subsidiary of Mastercard Incorporated.

17. Defendant Chase Bank USA, N.A., a Delaware bank with its principal place of business in Newark, Delaware, is the successor to Chase Manhattan Bank USA, N.A., and a wholly owned subsidiary of Defendant JPMorgan Chase & Co., a Delaware corporation with its principal place of business in New York, New York. Defendant Paymentech, LLC (f/k/a Chase Paymentech Solutions, LLC) is a limited liability company organized under the laws of Delaware, with its principal place of business in Dallas, Texas, and JPMorgan Chase & Co. is its majority parent. Defendants Chase Bank USA, N.A., Paymentech, LLC, and JPMorgan Chase & Co. are collectively referred to herein as "Chase." Chase is a member of both Visa and Mastercard. It is an issuing bank that issues credit cards to individuals and businesses throughout the United States. Between 2000 and 2003, Chase was represented on the Mastercard Board of Directors for the United States. Between 2003 and 2006, it was represented on the Visa U.S.A. Board of Directors, and it was represented on the Visa Inc. Board of Directors from 2008 until 2010. Through Defendant Paymentech, LLC, it is also an acquiring bank that provides card-acceptance services

to merchants. Chase has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

18. In July 2004, Chase completed its acquisition of Bank One Corporation and Bank One Delaware, N.A., which also had acted as an issuing bank and an acquiring bank. Before the acquisition, Bank One Corporation had actual knowledge of and knowingly participated in the conspiracies alleged in this Complaint. From at least 2000 until its acquisition by Chase, Bank One was represented on the Visa U.S.A. Board of Directors.

19. Defendant Citibank, N.A. is a bank with its principal place of business in New York, New York, and is a subsidiary of Defendant Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York. Defendants Citibank, N.A. and Citigroup, Inc. are collectively referred to herein as "Citi." Citi is a member of both Visa and Mastercard. It is an issuing bank that issues credit cards to individuals and businesses. It is also an acquiring bank that provides card-acceptance services to merchants. It has been represented on the Mastercard Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

20. Defendant Capital One Bank (USA), N.A., a Virginia bank with its principal place of business in Glen Allen, Virginia, and Capital One, N.A., a national bank with its principal place of business in McLean, Virginia, are wholly-owned subsidiaries of Defendant Capital One Financial Corporation, a Delaware corporation with its principal place of business in McLean, Virginia. Defendants Capital One Bank (USA), N.A. and Capital One Financial Corporation are collectively referred to as "Capital One." In 2025, Capital One acquired Discover Financial Services, making it the largest credit card issuer in the United States by loan balances. Capital One is a member of both Visa and Mastercard. Between 2000 and 2006, it was represented on the Mastercard Board of Directors. It is an issuing bank that issues credit cards to individuals and businesses. It is also an acquiring bank that provides card-acceptance services to merchants. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

21. Defendant Bank of America, N.A. is a national banking association with its principal place of business in Charlotte, North Carolina. Bank of America, N.A. is a wholly-owned subsidiary of NB Holdings, which is wholly owned by Defendant Bank of America Corporation, a Delaware corporation with its principal place of business in Charlotte, North Carolina. Defendants Bank of America, N.A. and Bank of America Corporation are collectively referred to as "Bank of America." Bank of America is a member of both Visa and Mastercard. Between 2000 and 2005 it was represented on the Visa U.S.A. Board of Directors. It is an issuing bank that issues credit cards to individuals and businesses. It is also an acquiring bank that provides card-acceptance services to merchants. Until 2020, Bank of America acquired transactions through BA Merchant Services LLC, which acted as an agent of Bank of America. Bank of America has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

22. Defendant Wells Fargo & Company is a Delaware corporation with its principal place of business in San Francisco, California. Wells Fargo is a member of both Visa and Mastercard. During parts of the relevant time period, it was represented on the Visa U.S.A. Board of Directors. It is an issuing bank that issues credit cards to individuals and businesses. Through its "Wells Fargo Merchant Services" division, it is an acquiring bank that provides card-acceptance services to merchants. Until 2025, Wells Fargo acquired transactions through Wells Fargo Merchant Services LLC, which acted as an agent of Wells Fargo. It has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint. In 2008, Wells Fargo acquired Wachovia Bank, N.A. Before the acquisition, Wachovia was a member of Visa and Mastercard that, between 2002 and 2006, was represented on the Visa U.S.A. Board of Directors. Wachovia acted as both an issuing bank and an acquiring bank during the relevant time period and had actual knowledge of, and knowingly participated in, the conspiracies alleged in this Complaint.

## III. JURISDICTION AND VENUE

23. This Court has original subject-matter jurisdiction over Plaintiff's federal law claims in this action under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), as well as Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. Because Plaintiff seeks relief for violations

of the Clayton Act and Sherman Antitrust Act, the Court also has original subject-matter jurisdiction over Plaintiff's federal law claims under 28 U.S.C. §§ 1331 and 1337(a). This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

24. This Court also has original subject-matter jurisdiction over the state law claims in this action under 28 U.S.C. § 1332(d) because it is a class action involving common legal or factual questions, with the total amount in controversy exceeding $5,000,000, excluding interest and costs. The Class includes over one hundred members, and at least one Class member is a citizen of a state different from that of any Defendant.

25. Venue is proper in this Court pursuant to, among other statutes, § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Defendants regularly transact business within this District, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

26. Defendants engage in, and their activities substantially affect, interstate trade and commerce. Defendants provide services that are marketed, distributed, and offered throughout the United States, including across state lines and in this District. Defendants' actions are ongoing and are likely to continue or recur, including through other practices with the same purpose or effect.

## IV. FACTUAL BACKGROUND

### A. The Visa and Mastercard Networks

27. From their beginnings in the 1960s, the networks now known as Mastercard and Visa were owned and operated by consortia of card-issuing "Member Banks." These Member Banks were competitors in other parts of their banking business. They competed daily for consumer business as credit card issuers, and in scores of other lines of banking business. But they came together as a cartel to run the affairs of the payment networks they originally named "BankAmericard" and "Master Charge" and later rechristened as "Visa" and "Mastercard." Among other things, they cooperated to establish effectively non-negotiable schedules of

payments—known as interchange fees—that merchants would be required to pay card-issuing banks out of each transaction.

28. U.S. antitrust law allows competitors involved in a joint enterprise to cooperate with their rivals and even set prices, under certain circumstances, *see Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010), but only to the minimal extent necessary to produce the joint product or service. What competitors may not do is agree to extract monopoly rents from customers. And yet that is exactly what the Visa and Mastercard membership associations did in setting interchange fees. Acting as a cartel, they conspired to impose a non-negotiable deadweight toll on every credit-card transaction.

29. By the early 2000s, the cartel structure of the associations was creating legal risk for the Member Banks, who came to understand that they needed to restructure their organizations to limit antitrust liability. In 2003, Mastercard and Visa lost an antitrust lawsuit brought by the federal government challenging certain of their network rules. *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003). And while that case concerned only the ability of the associations to ban their members from issuing American Express and Discover cards, the networks grew concerned that similar antitrust litigation could jeopardize their interchange fees because they had effectively been adjudicated structural conspiracies of constituent banks.

30. Thus, in 2003, Mastercard held a meeting attended by the banks represented on its Board of Directors where they discussed the likelihood that interchange revenues would decline as a result of antitrust challenges. The banks then directed Mastercard's management to review potential alternatives. In 2004, Mastercard made another presentation to the banks represented on its Board of Directors, showing that a new business model could reduce the antitrust risk while preserving the revenue from interchange fees received by the banks.

31. By 2005, merchants and their trade associations had begun filing lawsuits, which were aggregated in MDL 1720, challenging the networks as "structural conspiracies" or "walking

conspiracies." In response, Mastercard made the decision that it would undergo governance and ownership changes via a restructuring and initial public offering.

32. Mastercard's decision to pursue these governance and ownership changes was principally driven by its belief that the changes would help shield Mastercard and its Member Banks from antitrust liability arising from their establishment of uniform schedules of default interchange fees and enforcement of those default fees through the Challenged Restraints.

33. Visa had likewise commenced studying an IPO and restructuring by 2005. As with Mastercard, Visa's decision was driven by the desire to attempt to mitigate the antitrust liability that comes with operating as a walking conspiracy. Visa reasoned that the restructuring could help stave off tens of billions of dollars of additional damages liability that it was incurring each year, while it operated as a cartel of banks.

34. In the planning for both restructurings, bank executives sought and received assurances that the new "single-entity" networks would sustain the high interchange rates that the member-bank conspirators had established. Bank executives expressed that they were "uneasy" about the "lack of any direct link between Interchange levels and the P/L of" an independent and self-interested network. The major issuing banks thus wanted assurances from the networks that, following the IPOs, they would continue the cartel policy of extracting high interchange fees from merchants. In response, Mastercard assured the CEO of Capital One that there would be "little to no change" in interchange fee policy, and it satisfied senior Citi bankers that Mastercard would have "the same objective, pre and post" IPO.

35. Visa executives likewise sought to assuage bank issuer concerns that the IPO might alter the cartel's essential interchange fee strategy. Thus, Visa's Head of Global Interchange, Tolan Steele, drafted an assurance to bank issuers that, "though the Directors to whom we bring interchange decisions may have changed, the process that we go through to develop and deploy interchange enhancements will remain largely the same."

36. The restructurings, meanwhile, resulted in the Member Banks receiving substantial stock grants in the newly public companies. In exchange for their ownership interests in the pre-

IPO associations, Visa's Member Banks received Class B shares (for U.S. members) and Class C shares (for international members). These shares gave the banks veto power over transactions that might allow large merchants (or other third parties) to acquire a substantial stake in the network and exert influence over interchange rates. Moreover, for at least three years following the IPO, these stock grants gave Member Banks substantial direct voting rights in the new Visa, including the right to elect 6 of 17 directors. And until at least 2015, Member Banks retained effective veto power over certain extraordinary transactions, including any attempt to sell Visa or change the core business of Visa. No Visa shareholder may own more than 15 percent of Class A shares without advance approval of Visa's board.

37. Member Banks of Mastercard likewise received non-voting Class B shares and a Class M share with special voting rights. This Class M share gave Member Banks the right to elect up to 3 directors, as well as veto power over certain "significant" transactions after the IPO, and no Mastercard shareholder is allowed to acquire more than 15 percent of outstanding Class A and Class B shares.

38. The Bank Defendants maintained substantial direct influence, including voting rights and board representation, in the new Visa and Mastercard well after the IPOs. Chase was represented on the Visa Inc. Board of Directors from the IPO in March 2008 until 2010. Citi's Steven Freiberg, then Chairman and CEO of Citigroup Global Consumer Group North America, was appointed to Mastercard's Board of Directors as a Class M Director in September 2006 following the IPO—a position he held until 2022. Bank of America was represented on the Visa Board of Directors following the restructuring. Capital One's CEO, Richard Fairbank, served on the Mastercard Board of Directors until 2006 and received direct assurances from Mastercard management that the IPO would result in "little to no change" to interchange fee policy. All Bank Defendants retained significant, direct voting rights in the new Visa and Mastercard, including the ability to veto extraordinary transactions.

39. Most importantly, the restructurings left intact the Honor-All-Cards Rule, No-Surcharge Rule, and other Challenged Restraints discussed below that immunized interchange

rates from competitive forces. Indeed, Visa's Member Banks specifically conditioned the IPO on the requirement that Visa maintain its by-laws and rules, including the Challenged Restraints.

40. As the District Court in MDL 1720 found in 2024, this factual backdrop—including a) Visa and Mastercard's decisions to review their governance structures "to minimize the risk of litigation"; b) the networks' determinations that "IPOs would be in the best interest of the networks and their current members"; c) the networks' statements leading up to the IPO "ma[king] clear that they would continue to protect the business interests of the banks and reassured potential investors and bank members that nothing would change in terms of how the networks did business with their bank customers"; d) Member Banks' understanding "that the networks would continue to act in the best interests of the banks"; e) that Member Banks "specifically conditioned the IPO on the requirement that Visa maintain its by-laws and rules, including the HAC rules and default interchange rules"; f) that "the challenged network rules were readopted after the IPOs and remain in effect"; and g) that "Member Banks knew that other members would be bound by the rules both before and after the IPOs—and they have continued to abide by the rules and benefit from those rules"—all indicated that "the challenged rules are the product of continuing conspiracies between the Networks and the Bank Defendants." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* ("*Payment Card*"), No. 05-md-1720 (MKB), 2024 WL 1014159, at *22 (E.D.N.Y. Mar. 8, 2024) (finding dispute of fact over ongoing nature of conspiracy, and a "lack of evidence that Defendants effectively withdrew from the conspiracy," as of 2024).

41. Not only do the Challenged Restraints sustain and protect the product of the original price-fixing conspiracies, but the Challenged Restraints are themselves the product of ongoing hub-and-spoke conspiracies. As the District Court recognized in *Barry's Cut Rate Stores, Inc. v. Visa, Inc.*, No. 05-md-1720, 2019 U.S. Dist. LEXIS 205335, at *182 (E.D.N.Y. Nov. 20, 2019), Visa and Mastercard (the hubs) maintain agreements with each of the major issuing banks (the spokes), under which each such bank agrees that its cards may only be used subject to the merchant restraints. Each Member Bank—including the Bank Defendants—has covenanted in its agreements with Visa and Mastercard that it will adhere to the No-Surcharge Rule, Honor-All-

Cards Rule, and other merchant restraints that act together to effectively prevent its cards from being used by merchants except at the inflated default interchange rates set by Visa and Mastercard and to prevent competition among issuers and from other credit card networks.

42. In entering and reaffirming these agreements with Visa and Mastercard, each conspirator bank was and is aware that the other banks were committing to the same terms. Indeed, *the very first* Visa Network Rule—Rule 1.1.1.1—begins by confirming: "*All participants in the Visa system* are subject to and bound by the Visa Charter Documents and the Visa Rules" (emphasis added). Likewise, Mastercard Rule 1.6 states: "Each Customer agrees, and by use of any one or more of the Marks agrees, to comply with all provisions of the License pertaining to use of the Marks and with the Standards of this Corporation as may be in effect from time to time."

43. Visa and Mastercard update and reimpose their Rules on a periodic basis, and each Member Bank—including each Bank Defendant—reaffirms its agreement to each of the Challenged Restraints as those Rules are reissued. Likewise, each iteration of the Rules confirms again that "[a]ll participants" in the system will be bound by the Rules. The most recent editions of the Rules took effect on April 18, 2026 for Visa and June 2, 2026 for Mastercard.

44. Visa and Mastercard, in turn, approve and disseminate updated default interchange fee schedules on a regular basis, in April and October of each year, and the Challenged Restraints make those schedules effectively mandatory upon issuance. The most recent schedules took effect on April 18, 2026 for Visa and April 17, 2026 for Mastercard.

45. None of the banks would have agreed to the terms of its deal with Visa and Mastercard but for that bank's knowledge that its competitors are similarly bound. It would "be disadvantageous for [the] Bank [conspirators] to adhere to the restraints unless they possessed knowledge that all others similarly situated would also adhere to those same restraints." *Barry's Cut Rate Stores*, 2019 U.S. Dist. LEXIS 205335, at *182 (upholding allegations of hub-and-spoke conspiracy). In fact, "it would be plainly contrary to the economic self-interest of a Member Bank to independently agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from steering purchasers to its cards." *Id.*

46. The knowing reliance of each conspirator bank (spoke) that each other conspirator bank (spoke) has likewise agreed to the anticompetitive restraints with Visa and Mastercard (hubs) furnishes the "rim" that binds all of the anticompetitive vertical agreements between each network and the conspirator banks into a horizontal hub-and-spoke conspiracy with Visa and a horizontal hub-and-spoke conspiracy with Mastercard.

47. Nor are these dual hub-and-spoke conspiracies truly separate from each other: Visa and Mastercard are not comprised of distinct groups of Member Banks but rather, by and large, of the *same* Member Banks. Indeed, each of the Bank Defendants—who, together, comprise the vast majority of all cards issued on both Visa's and Mastercard's networks—is a Member Bank of *both* the Visa and Mastercard networks, issues cards bearing both networks' marks, and agrees to comply with both sets of Network Rules, including the Challenged Restraints. That the same Member Banks participate in each conspiracy further solidifies the "rim" around each agreement, ensuring that no Member Bank or Network has any incentive to defect from the anticompetitive Challenged Restraints.

48. No Defendant has taken any affirmative step to withdraw from these conspiracies at any time since the restructurings. *See Payment Card*, 2024 WL 1014159, at *22 (finding a "lack of evidence that Defendants effectively withdrew from the conspiracy"). Defendants and their Member Banks continue to reap tens of billions of dollars annually from supracompetitive interchange fees and related practices alleged herein. Each Member Bank understands that the restructurings changed nothing for it: absent a bilateral agreement, it will continue to collect supracompetitive interchange fees at the default rates—and the Challenged Restraints disincentivize such bilateral agreements to the vanishing point.

49. Moreover, even independently of these horizontal agreements, the Challenged Restraints constitute anticompetitive agreements in restraint of trade. Visa and Mastercard use the Challenged Restraints—to which all merchants must agree as a condition of accepting Defendants' cards—to prevent merchants from negotiating lower interchange fees or network fees or steering transactions to lower-cost payment options. These Restraints thus operate as agreements

preventing merchants from negotiating, and issuing banks from offering, lower fees, maintaining fees at supracompetitive levels marketwide.

50. In the networks' early years, a merchant that accepted credit cards conducted each transaction on paper forms known as "drafts." By the mid-1980s, technology had advanced to the point that many transactions were processed electronically, and paper drafts were no longer needed for most credit card transactions. From that time on, the costs Visa and Mastercard bear for the various components of credit card transaction processing—computer hardware, telephone service, network service, and data-processing services, for example—have decreased significantly, and those changes yielded significant reductions in what it costs Visa and Mastercard to process credit card transactions.

51. Once Visa and Mastercard began operating on a national scale, use of their cards climbed dramatically: in 1970, only 16% of households had a credit card, but by 2026, at least 81% of U.S. adults had at least one. Today, there are more than 2.29 billion Mastercard- and Visa-branded cards in circulation in the United States alone.

52. Alongside that growth, the Networks' Member Banks, and in particular the Bank Defendants, have undergone substantial consolidation. Defendant Bank of America's 2006 acquisition of MBNA made it, immediately, the largest issuer of credit cards in the United States. Defendant Chase's 2004 acquisition of Bank One had a comparable effect: Chase was then already the nation's fourth largest card issuer, and the combined entity became the largest issuer in the United States. Most recently, Defendant Capital One's 2025 acquisition of Discover Financial Services for $35.3 billion made it the largest credit card issuer in the United States by loan balances.

53. In 2024, the top five credit card-issuing banks accounted for 69% of all credit card purchase volume in the United States, while the top ten issuers controlled over 82% of total credit card spending. That same year, approximately 80% of Visa and Mastercard transaction volume was acquired by five merchant acquirers.

54. That Visa and Mastercard evolved through horizontal agreements sets them apart from American Express, Discover, and other "three-party" networks, which built their merchant and cardholder bases independently, without a cooperating partner on the other "side" of the platform. In a three-party network such as American Express or Discover, the network operator serves as both the issuer and the acquirer for the vast majority of transactions involving its cards and stands as the only intermediary between the merchant and the cardholder.

**B. The Structure of a Credit Card Transaction**

55. A credit card payment travels a defined path. Take a prototypical transaction in which a cardholder uses a Visa-branded credit card—issued to her by a credit-card-issuing bank such as Wells Fargo or Bank of America—to purchase goods at a merchant. First, the cardholder inserts, swipes, or taps her card at the merchant's payment interface. The payment interface immediately sends an electronic record of the transaction to the merchant's "acquiring bank." Sometimes also called an "acquirer," the acquiring bank is a bank or nonbank financial institution affiliated with the Visa network with whom the merchant contracts to handle its payment card transactions.

56. Having received the transaction message from the merchant, the acquiring bank then sends the message on to the Visa network, which in turn directs the message to the cardholder's issuing bank. If there are sufficient funds or credit on hand and the account is in good standing, the issuing bank transmits an authorizing message back via the network, and the acquiring bank then commits to "acquire" the transaction from the merchant, for the face amount minus a fee paid by the merchant, known as the "merchant discount fee," also referred to as the "swipe fee." This whole process unfolds in seconds, or less, with each swipe or insertion of a card.

57. The merchant discount fee has several components. The majority of the merchant discount fee is comprised of the so-called "interchange fee," which is the fee that is paid to the issuing bank on each transaction. The interchange fee level, or "interchange rate," is set centrally by Visa (or Mastercard, as the case may be) and varies according to such factors as merchant industry (e.g., gas stations vs. restaurants vs. airlines), merchant annual dollar volume levels, the

type of credit card used (high-reward, regular-reward, other) and the physical device on which the transaction was entered (chip reader vs. manually keyed vs. automated gas pump, etc.), among other things.

58. The merchant discount fee also includes network fees—paid directly to Visa and Mastercard—assessed on each transaction for use of Defendants' networks. Finally, the merchant discount fee includes an acquirer markup—the amount paid to the merchant's acquiring bank, set independently from the standard interchange and network fees.

59. The process changes somewhat when a mobile payment transaction is initiated on a mobile device. The user first sets the mobile device to allow mobile payment transactions by enabling a setting on the device and supplying the mobile platform (such as Apple, Google/Android, or Microsoft) with account information for the credit card accounts he or she desires to use in mobile payment transactions. The mobile platform communicates that request to the user's issuing bank, which communicates with the network to create a user-specific identifier; the identifier is then embedded into the secure portion of the mobile device's memory chip. At the point of sale, the user presents the mobile device and initiates the transaction with an alphanumeric password or a biometric identifier, such as a fingerprint. A request to authorize the transaction travels from the payment interface to the acquirer, then to the network, as in a plastic-card-based transaction; upon receiving the data, the network looks up the user's identifier, inserts it into the authorization request to the issuer, and the issuer approves or denies the transaction. Yet notwithstanding the presence of a mobile device and the additional security features of a mobile payment transaction, the Defendants' anticompetitive rules—the Honor-All-Cards Rules and the No-Surcharge Rules among them—apply in full force, just as in plastic-card-based transactions.

60. While the above paragraphs describe card-present transactions, in which the card or mobile device is used in person at a merchant, card-not-present transactions—in which the cardholder pays online, in an app, or over the phone—work in essentially the same way. Rather than present a physical card, the cardholder enters his or her card number, expiration date, and security code at the merchant's checkout, or selects credentials stored in a digital wallet; the

merchant's payment interface transmits those credentials to the acquiring bank, which routes the authorization request over the network to the issuing bank; and the issuer approves or declines the transaction. These transactions typically rely on security measures such as multi-factor authentication rather than a chip or PIN, but they otherwise proceed across the same banks and network, carry interchange and network fees, and are subject to the same Honor-All-Cards and No-Surcharge Rules as card-present transactions.

61. Interchange fees are set centrally by the Networks. Visa Rule 1.8.1.2 defines the Interchange Reimbursement Fee as "a default transfer price" that Visa "consistently monitor[s] and adjust[s]," and provides that "Visa may establish different Interchange Reimbursement Fees in order to promote a variety of system objectives." Visa publishes those rates on its U.S. interchange schedule, and under Rule 1.8.1.3, a transaction receives a given rate only if it meets "the qualifications defined in the Visa Rules and in the applicable Interchange Reimbursement Fee rate qualification guide." Under Rule 1.8.2.2, those default rates govern every transaction unless displaced by "bilateral agreements, Visa-Administered Bilateral Agreements, or Private Agreements."

62. Mastercard's counterpart is Rule 8.3, which states: "A transaction settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable. [Mastercard] has the right to establish default interchange fees and default service fees . . . . Unless an applicable bilateral interchange fee or service fee agreement between two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers." In Mastercard parlance, the "Customer" of Rule 8.3 means a "Member Bank."

63. The Rules thus permit deviations from "default" interchange fees in theory; in practice, the Challenged Restraints ensure that the "default" rates are the prices that all or nearly all issuing banks charge merchants that accept their cards. Because of the Challenged Restraints, bilateral negotiations between an issuer and a merchant or group of merchants are almost nonexistent. When questioned, Mastercard witnesses have admitted that there were only a few

bilateral agreements in the United States, while Visa witnesses could identify only a single bilateral agreement in the United States, despite the existence of millions of merchants and thousands of issuing banks and despite the technological capacity to facilitate millions of bilateral agreements.

64. The default interchange rules date from the era in which the Bank Defendants and other Member Banks owned and controlled Visa and Mastercard, and votes of the networks' boards of directors—boards composed of Member Bank employees—reaffirmed those Rules continually. Their adoption had both the purpose and the effect of inflating merchants' costs of accepting credit cards and of using the supracompetitive profits from those interchange fees to line the pockets of the Member Banks.

65. Visa and Mastercard have each constructed complex "default" interchange fee schedules. Default interchange encompasses both the fee levels and the structure of the fees—including interchange fee categories tiered by merchant type, card type, and the merchant's transaction volume, among other things. Of the costs merchants bear to accept such cards, interchange fees account for the largest portion.

66. Until the Visa and Mastercard IPOs, the competing Bank Defendants and other Member Banks occupying the seats on the networks' boards regularly adopted the networks' uniform schedules of default interchange fees by vote—usually semiannually. The restructurings did not end the practice: the new networks have continued adopting uniform schedules of default interchange fees on the same semiannual schedule.

67. Defendants monitor and enforce their Member Banks' compliance with their uniform schedule of default interchange fees. The networks' IT systems review each transaction to ensure the "correct" default interchange rate is applied—so if an acquiring bank attempted to "cheat" on a particular transaction by applying an interchange rate lower than the default rate, the networks' systems would intervene and raise the rate back to the default.

68. Those same IT systems also have the capacity to facilitate millions of bilateral agreements between issuers and merchants. T.J. Sharkey—the head of Mastercard's Global

Merchant and Acquirers Group—testified that he is aware of no limit on the number of bilateral agreements that Mastercard's system can accommodate.

69. The Visa and Mastercard Rules further require that a Member Bank be a party to all or nearly all merchant contracts for the acceptance of Visa and Mastercard credit cards—a requirement that reaches even merchants and banks using "Payment Facilitators" such as Third-Party Processors or Independent Sales Organizations (also known as "ISOs").

70. Payment Facilitators, such as Square and Intuit, contract with small and medium-sized businesses to facilitate their acceptance of credit cards, including by establishing contractual relationships with acquiring banks, providing merchants with hardware and software enabling them to accept credit cards, and serving as an intermediary by sending transaction information to acquiring banks on merchants' behalf. As Visa and Mastercard have observed throughout MDL 1720, Payment Facilitators are not themselves card-accepting merchants, but instead serve as "agents of the merchants they service[]." *Payment Card*, ECF No. 9525 at 2; *see id.* ("[T]he fact of the principal-agent relationship is clear from the face of the contracts between Intuit and Square and their merchant customers."). Payment Facilitators, moreover, must include the network-mandated terms in their agreements with merchants, including the obligation to abide by all Visa or Mastercard Rules. *See* Visa Core Rule 1.5.2.1; Visa Product and Service Rule 5.3.1; Mastercard Rules 7.2.1 & 7.6.

71. Interchange fees were devised in the networks' early days. They purportedly helped defray the costs of initial card issuance, marketing, and transferring transactional paper—which in that era literally was paper—between acquiring and issuing banks, and they purportedly balanced network costs between issuers and acquirers. Those early interchange fees were cost-based and, in Visa's case, set with the help of independent auditing firms. Credit card interchange fees were also purportedly necessary, in the networks' early days, to induce banks to issue credit cards to cardholders.

72. Whatever validity those initially proffered justifications for collectively set, uniform schedules of default credit card interchange fees may once have had, they hold no validity

now: interchange fees are no longer cost-based, and the networks no longer need to incent card issuance to establish their networks.

73. Technology has evolved greatly since the networks' early days. The networks now have the technological capability to facilitate bilateral agreements among issuing banks, acquiring banks, and merchants, and to facilitate the settlement of funds pursuant to those bilateral agreements; and issuers, for their part, have the technological capability to enter into bilateral agreements with merchants and to settle transactions pursuant to those agreements.

74. Unlike in the networks' early days, Visa and Mastercard now have market power in the Relevant Market, jointly and separately. Even in the face of frequent and significant increases in interchange fees, merchants have no choice but to continue accepting Visa's and Mastercard's dominant credit cards. Both Visa and Mastercard repeatedly and substantially increased the total interchange fees charged to and paid by merchants, yet experienced no decline in merchant acceptance.

75. The interchange fee is not what funds Visa's and Mastercard's operations—the issuing bank retains that fee on every transaction. Visa and Mastercard instead profit through other means. First, they charge supracompetitive "network fees," beyond and separate from their assessment of interchange fees, for the use of their networks.

76. Visa and Mastercard impose both per-transaction fees and fixed fees on merchants. Per-transaction fees include a roughly 0.15% assessment on every transaction routed through Visa or Mastercard's network. Fixed fees include network access fees, such as Visa's Fixed Acquirer Network Fee or "FANF." If a merchant accepts any Visa credit card transactions, the merchant must pay a fixed fee to "access" Visa's networks, which increases with the number of locations that the merchant operates. Like interchange fees, Visa's and Mastercard's network fees are mandatory and effectively non-negotiable, and the Challenged Restraints likewise prevent competitive forces from leading to lower network fees.

77. Second, Visa and Mastercard also charge per-transaction and fixed fees to issuing banks. These include fees for authorization and clearing of transactions, network-access fees,

currency-conversion fees, and various other service fees the networks assess Member Banks. The Challenged Restraints further inflate these issuer-side network fees: by increasing the interchange fees Member Banks receive, the Challenged Restraints enable Visa and Mastercard to inflate the fees they charge Member Banks—in effect, sharing the monopoly profits created by Defendants' price-fixing scheme.

### C. Visa and Mastercard's Mandatory Merchant Rules Prevent Competition on Interchange and Network Fees

78. Despite the ability of Visa and Mastercard's networks to facilitate bilateral agreements among merchants and banks, Defendants use a series of anticompetitive Network Rules—to which all issuers, acquirers, and merchants must agree—to prevent merchants from negotiating lower fees or steering transactions to lower-cost payment options. These Rules thus operate, individually and collectively, to prevent issuing banks from gaining a competitive advantage from offering lower interchange fees to merchants, and to prevent alternative, cheaper payment options from forcing Visa and Mastercard to offer lower network fees, thus maintaining fees at supracompetitive levels marketwide.

79. Visa and Mastercard require acquiring banks to write these Network Rules—including the Challenged Restraints—directly into their merchant agreements, which is how merchants end up bound by them. *See* Visa Core Rules § 1.5.2.1; Mastercard Rules § 5.1.2. And Visa and Mastercard require the acquiring banks to penalize any merchant that fails to adhere to the Rules. The Challenged Restraints include the following:

#### (1) No-Surcharge Rules

80. The No-Surcharge Rules of Visa, Mastercard, and rival credit card networks prevent merchants from using the price mechanism to give customers incentives to use less expensive payment products.

81. For years, Defendants' rules flatly prohibited merchants from surcharging based on a cardholder's use of a particular card—thus preventing merchants from steering customers to cheaper card options (either by issuing bank—Bank of America rather than Wells Fargo, for

instance—or by product category—a standard card rather than a premium rewards card). In 2013, Defendants altered these rules to nominally permit surcharging in narrow circumstances. Restrictions on surcharging included: 1) advance notice and customer disclosure requirements; 2) rules against surcharging particular issuing banks; 3) requirements that surcharges be less than a merchant's acceptance costs; and 4) an overall percentage cap.

82. More important, above and beyond these restrictions, surcharging remains effectively banned at *any merchant that accepts American Express.* Ninety-nine percent of merchants who accept credit cards accept American Express, and transactions at those merchants constitute roughly 90 percent of Defendants' card volume. Visa and Mastercard have continued to support, piggyback on, and functionally incorporate that American Express rule to pervasive effect.

83. As presently constituted, Visa's No-Surcharge Rule is set forth at Section 5.5 of the public version of its Merchant Rules. Section 5.5.1.6 is entitled "Similar Treatment of Visa Transactions – US Region and US Territories" and provides that a "Merchant must not assess a US Credit Card Surcharge on Visa Credit Card Transactions" if (among other restrictions) the "Merchant is prohibited or effectively prohibited by a Competitive Credit Card Brand from assessing surcharges on the Competitive Credit Card Brand's products."

84. Mastercard's No-Surcharge Rule mirrors Visa's No-Surcharge Rule. It is set forth at Section 5.12.2 of the public version of the Mastercard Rules.

85. American Express is a "Competitive Credit Card Brand," within the meaning of Visa Rule 5.5.1.6 and Mastercard Rule 5.12.2. Thus, Visa and Mastercard's rules both prop up and piggyback on the no-surcharge rule imposed by American Express. Specifically, the American Express rule that "effectively prohibit[s]" merchants from assessing surcharges on American Express transactions, *id.*, is found in American Express Merchant Rule § 3.2, which provides that a merchant may not impose a surcharge upon an American Express credit card unless the merchant also assesses the same surcharge on all "Other Payment Products." That section specifically defines "Other Payment Products" to include Visa- and Mastercard-branded debit cards.

86. But imposing a similar surcharge on debit cards as upon American Express and other credit cards is impossible. Visa rules ban surcharges on debit card transactions. Visa Core Rule § 5.5.1.9. And even if debit card surcharges were allowed, it would not be economically rational to impose an equal surcharge on debit transactions, as would be required as a condition of surcharging credit cards under the American Express rules that Visa and Mastercard incorporate by reference. The main point of surcharging credit cards is to drive traffic to cheaper payment forms—and specifically to debit. Across the U.S., the average merchant discount rates for purchases on Visa, Mastercard, and American Express all exceed 2.5%. Meanwhile, the average discount rate on debit transactions is well under 1%. So, debit is a product that merchants want to steer toward, and not away from, at least where the sale otherwise will be paid by credit card. For this reason, American Express has, in effect, a flat ban on surcharging.

87. To summarize: Visa and Mastercard prohibit credit-card surcharges if the merchant is "effectively prohibited" from surcharging American Express (or other) cards. American Express allows surcharging only if the merchant also imposes the same surcharge on Visa debit card transactions. But Visa flatly bans surcharges on debit card transactions. So merchants are effectively prohibited from surcharging American Express cards. It follows that Visa and Mastercard ban credit-card surcharges in the United States for those merchants who accept American Express. And American Express cards are accepted by merchants who account for roughly 90% of Visa and Mastercard credit-card transaction volume.

88. The Equitable Settlement filed in November 2025 would, if approved and implemented, reform these surcharging restrictions. Most importantly, the Equitable Settlement would eliminate the rules described above that effectively prohibit surcharging by merchants that accept American Express. Under the Equitable Settlement, all merchants would be permitted to surcharge Visa and Mastercard credit cards at the brand or product level, up to the lesser of the full cost of acceptance or 3%, regardless of whether they accept or surcharge American Express or other competing cards. The Equitable Settlement would also simplify the surcharging rules, permit dual pricing to comply with state laws that restrict surcharging, and prohibit the networks

from retaliating against merchants that surcharge or threaten to surcharge. But even if the Equitable Settlement is finally approved, these changes would become effective only 90 days after final approval, would apply only prospectively, and would provide no compensation to merchants—including Plaintiff—for the supracompetitive fees they have paid and continue to pay under the current rules.

89. The fact that Visa and Mastercard have agreed to these reforms demonstrates that their surcharging restrictions are not necessary for the operation of their networks.

**(2) Honor-All-Cards Rules**

90. Visa and Mastercard each enforce Honor-All-Cards Rules, under which a merchant that accepts any Visa- or Mastercard-branded credit card must accept every credit card bearing that brand—regardless of the identity of the issuing bank, the card product, or the cost of accepting that card. For Visa, the rule is reflected in Visa Core Rules 1.5.4 and 5.4.1.1; for Mastercard, the Honor-All-Cards Rule is embodied in Rule 5.11.1.

91. Put differently: once a merchant agrees to accept any Visa or Mastercard credit card, the Honor-All-Cards Rules bind it to accept every Visa or Mastercard credit card—premium credit cards, with their elevated fees, included.

92. Defendants have extended that same all-or-nothing logic to digital wallets and mobile-device payments through their interpretation of the Honor-All-Cards Rules and related acceptance rules to apply to mobile payments. A merchant that accepts a Visa- or Mastercard-affiliated digital-wallet payment on a given technology must accept every Visa- or Mastercard-affiliated digital-wallet transaction on that technology—the "Honor-All-Wallets" Rule.

93. Under the Honor-All-Cards Rule, card product, issuing bank, and interchange fee are stripped of their natural competitive significance—the merchant has no way to accept the technology while declining the high-cost transactions that ride along with it. What results is, in substance, an agreement among the issuing banks to forgo competing for merchants' acceptance of their cards: stripped of any need to win that acceptance individually, the issuing banks lose whatever incentive they might otherwise have had to compete on price or terms by lowering their

interchange fees. The default interchange fees thus become binding on merchants not because merchants agreed to them, but because the Rules leave no room to refuse them.

94. The Equitable Settlement filed in November 2025 would, if approved and implemented, reform the Honor-All-Cards Rules and permit merchants to accept only standard credit-card products without accepting higher-cost premium consumer and/or commercial credit cards. Merchants would also no longer be required to accept digital wallets merely because they contain Visa or Mastercard credit cards. But even if the Equitable Settlement is finally approved, these changes would become effective only 90 days after final approval, would apply only prospectively, and would provide no compensation to merchants—including Plaintiff—for the supracompetitive fees they have paid and continue to pay under the current rules.

95. The fact that Visa and Mastercard have agreed to these reforms demonstrates that the Honor-All-Cards Rules are not necessary for the operation of their networks.

**(3) No-Discount Rules**

96. Defendants spent many years enforcing No-Discount Rules, under which a merchant could discount for cash or checks but not for a customer's choice of a particular credit card. That changed in part in 2011: under a consent decree with the Department of Justice, Visa and Mastercard revised the rules to permit discounting by card brand (Discover rather than Visa, for instance) or by product category (a standard card rather than a premium one). However, discounting by issuing bank within a single product category remained off-limits. A merchant discounting one issuing bank's standard card, in other words, had to extend the identical discount to every other issuing bank's standard card in that same tier. *See* Visa Core Rules § 1.5.4.11; Mastercard Rules § 5.12.1 (Additional U.S. Region and U.S. Territory Rules). The revision, as a result, left issuing banks with no more incentive to compete against one another than they had before.

97. Moreover, discounting suffers from an inherent "installed base" problem that limits its effectiveness as a competitive tool: when a merchant offers a discount for using a lower-cost payment method, it must extend that discount to all customers who use that method—including

customers who would have used the cheaper payment method regardless of the incentive. Discounting thus imposes a cost on the merchant's existing base of lower-cost transactions, reducing or eliminating any net savings. Surcharging and non-acceptance, by contrast, impose costs only on customers who insist on using higher-cost cards, making them more effective mechanisms for steering.

**(4) No-Bypass Rules**

98. The No-Bypass Rules bar merchants and Member Banks from routing around the Visa or Mastercard system—and thereby around the supracompetitive interchange fees and network fees—to clear, authorize, or settle a credit card transaction on some alternative network. That prohibition holds even where the issuing bank and the acquiring bank are one and the same, and even where a single third-party processor has agreements with both banks on the transaction in question. The No-Bypass Rules thus foreclose issuing and acquiring banks from routing Visa or Mastercard transactions directly between themselves outside the networks, and they foreclose those banks from competing for merchant acceptance by offering lower-cost bilateral routing arrangements.

**(5) No-Competing-Marks Rules**

99. Under the No-Competing-Marks Rules, a Visa- or Mastercard-branded credit card may not also carry the mark of a rival credit card network — no card, in other words, may be enabled to run on more than one network. *See* Visa Core Rules § 1.3.4.6; Mastercard Rules § 4.9. That prohibition forecloses a specific competitive option: a merchant cannot lower its acceptance costs by routing a transaction to a lower-fee alternative network such as Discover, because no card exists that would let it do so. Stripped of the ability to route transactions toward cheaper networks or steer cardholders toward lower-cost options, merchants lose a tool that would otherwise pressure Visa, Mastercard, and the Bank Defendants and other issuing banks to compete on fees.

**(6) All-Outlets Rules**

100. The All-Outlets Rules require a merchant that accepts Visa- or Mastercard-branded credit cards at one location to accept them at every location operating under the same trade name.

That requirement forecloses two things at once: a merchant cannot pilot location-specific acceptance policies or payment-steering strategies at some outlets before rolling them out chain-wide, and it cannot use its acceptance decisions at individual locations as leverage to negotiate better terms with issuing banks.

#### (7) The Challenged Restraints as a Whole Prevent Competition on Interchange and Network Fees

101. Independently and as a whole, the Challenged Restraints described above operate to prevent competition both among issuing banks, including the Bank Defendants, and between competing networks, including Visa and Mastercard. Because merchants cannot impose a surcharge, decline to accept high-cost cards, or otherwise steer transactions based on the issuer, type of card, or cost of acceptance, they cannot use the price mechanism to inform cardholders of the cost differences between payment methods or to direct consumers toward lower-cost alternatives. This eliminates the competitive pressure that would otherwise force issuing banks to lower their interchange fees.

102. Moreover, the Challenged Restraints undermine inter-network competition, enhance Visa and Mastercard's market power, and facilitate inflated network fees. Because merchants cannot differentiate between networks or surcharge at the point of sale based on cost, Visa and Mastercard face no competitive pressure to reduce their per-transaction network fees or other fees, or to otherwise compete to offer lower overall merchant-discount fees. Nor are lower-cost alternatives able to effectively compete on transaction price by offering either lower interchange fees, lower network fees, or lower overall merchant-discount fees, thus preventing alternative payment options from making inroads on Visa and Mastercard's market share. For example, when Discover attempted to compete by offering lower merchant fees, its efforts failed because merchants could not use surcharging to steer customers toward Discover and away from the higher-cost Visa and Mastercard cards. As a result, the Challenged Restraints—by foreclosing price-based competition both among issuing banks and among rival networks—have maintained supracompetitive fees on both interchange and network services.

### D. Neither the MDL 1720 Damages Settlement nor the Proposed Equitable Settlement Provides Relief to Plaintiff or the Proposed Class for their Ongoing, Present-Day Overcharges

103. For over two decades, merchants have challenged Defendants' horizontal and vertical agreements to maintain supracompetitive merchant fees under the antitrust laws.

104. In 2005, several actions bringing federal antitrust claims against Visa, Mastercard, and issuing and acquiring banks were consolidated into a multidistrict litigation in the Eastern District of New York. *See Payment Card*, 2008 WL 115104, at *1.

105. Those suits alleged that the card networks and banks imposed anticompetitive restraints that artificially inflated the fees they charged merchants. The District Court appointed Interim Class Counsel to represent merchants that purchased credit card processing services from Visa, Mastercard, and their Member Banks. *See Payment Card*, 2006 WL 2038650, at *1.

106. In 2012, the parties reached a settlement agreement on behalf of a Rule 23(b)(3) damages class and a Rule 23(b)(2) injunctive relief class, which the District Court approved in 2013. *See Payment Card*, 986 F. Supp. 2d 207, 241 (E.D.N.Y. 2013). That agreement split the plaintiffs into a damages class, which would receive more than $7 billion in compensation, and an equitable relief class, which would receive minor reforms to the Network Rules. *Id.* at 213.

107. On appeal, the Second Circuit held that Class Counsel's simultaneous representation of both classes was improper and reversed settlement approval. *See Payment Card*, 827 F.3d 223, 240 (2d Cir. 2016). The damages class, the court reasoned, "would want to maximize cash compensation for past harm," while the injunction class "would want to maximize restraints on network rules to prevent harm in the future." *Id.* at 233.

108. On remand, the damages class proceeded separately from the injunction class and entered a new settlement worth $5.6 billion. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 714 (2d Cir. 2023). The class it defined reached "all persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date"—

January 24, 2019. *Id.* This Court gave final approval to the settlement, and the Second Circuit affirmed.

109. The settlement stated that class members—effectively, every card-accepting merchant in existence between January 2004 and January 2019—released all "claims 'arising out of or relating to' any conduct or acts that were or could have been alleged in the litigation." This release stated that it extended to all claims that accrued "no later than five years after the Settlement Final Date." *Id.* The Settlement Final Date—ten business days after all appeals were exhausted—is August 8, 2023, extending the release to August 8, 2028.

110. Meanwhile, litigation of the equitable relief class continued in the District Court. In June 2024, the District Court denied preliminary approval of a proposed settlement agreement between the equitable relief class and Visa and Mastercard. The Court found that the prior agreement provided little Honor-All-Cards relief, granted only limited surcharging relief (prohibiting surcharges of more than 1% if the merchant did not also surcharge American Express, which the American Express rules do not allow), and treated class members unequally by providing direct rate reductions to merchants that pay posted rates but not to those that pay negotiated rates.

111. Following the June 2024 denial, renewed settlement negotiations led to the amended Equitable Settlement, filed November 10, 2025. The amended Equitable Settlement purports to remedy the Court's concerns and provides greater relief than the prior agreement. Among other things, the Equitable Settlement would enact more significant changes to the Honor-All-Cards rules, permitting merchants to decline networks' high-cost premium consumer credit cards and commercial credit cards. The Equitable Settlement would also allow merchants to surcharge the networks' credit cards up to 3%—regardless of whether the merchant also accepts or surcharges American Express—and would mandate rate reductions benefiting all merchants, including those that pay negotiated rates.

112. The Equitable Settlement's substantive terms include the following key provisions: (i) Honor-All-Cards reforms permitting merchants, for the first time, to accept lower-cost standard

consumer credit cards without having to accept higher-cost premium consumer credit cards, and to accept only consumer credit cards while declining commercial credit cards; (ii) surcharging relief allowing all merchants to surcharge at the brand or product level, up to the lesser of the full cost of acceptance or 3%, regardless of whether they accept American Express or other competitive cards; (iii) discounting reforms extending the expired DOJ consent decree that required Visa and Mastercard to permit discounting at the brand and product levels, as well as issuer-level discounting; (iv) a cap on the interchange rates on Standard consumer credit cards at 125 basis points for at least eight years; and (v) immediate rate relief mandating a 10-basis-point reduction in systemwide average effective interchange rates for five years, with a pro rata reduction for merchants that pay negotiated rates.

113. On June 9, 2026, the District Court granted preliminary approval of the Equitable Settlement and held that it was "likely to grant final approval." *Payment Card*, ECF No. 9884 at 29. The Equitable Settlement's substantive rules relief would become effective 90 days after the District Court grants final approval and would extend for at least eight years.

114. To summarize: the MDL 1720 Damages Settlement provided monetary relief to all merchants that accepted credit cards *before* January 2019. The MDL 1720 Equitable Settlement, if approved, will provide injunctive relief to all merchants that accept cards *after* 90 days from its final approval. This settlement structure leaves a gap: merchants that accepted cards *after* January 2019 and *before* the approval of the Equitable Settlement, who receive no compensation for their ongoing injuries. Even assuming the Equitable Settlement will eventually lessen the effects of these anticompetitive restraints, Defendants today face no consequences whatsoever for their continued unlawful conduct—and Plaintiff bears the continued brunt of Defendants' inflated fees.

**E. The Challenged Restraints Harm Competition**

115. Defendants' Rules requiring the payment of default interchange fees on every transaction—and the use of the Challenged Restraints to ensure that merchants cannot contract around those default fees, steer cardholders to less expensive options, or successfully negotiate with networks or banks lower overall fees—restrain competition in the Relevant Market. This

harm to competition enables the imposition of large and ever-increasing interchange fees and network fees, which thereby elevate the total fees merchants pay to Defendants to supracompetitive levels.

116. Due to the Challenged Restraints, cardholders do not know the actual costs of the interchange and network fees that merchants pay—and merchants are unable to guide cardholders to the most cost-effective payment methods. As a result, these rules combine to ensure that issuing banks have no incentive to contract around Defendants' default interchange fees, negotiate directly with merchants, or otherwise lower their interchange fees to a rate below that set by Visa and Mastercard—because, even if they were to do so, the Challenged Restraints would prevent them from gaining any market share at the register.

117. Similarly, because of the Challenged Restraints, a credit card network that charges network fees and overall merchant fees lower than the Defendants' fees will be unable to make inroads on the dominant market positions of Visa and Mastercard. Potential new market entrants and competitors stand ready, willing, and able to compete with the Defendants by offering lower network and overall merchant fees, but the Defendants' rules prevent and restrain any such competition by ensuring that increased efficiency and lower prices will not lead to increased market share for competitors in the Relevant Market.

118. The Honor-All-Cards Rule, the No-Surcharge Rule, and additional Challenged Restraints date from the period when the Member Banks, including the Bank Defendants, owned and controlled Visa and Mastercard, and votes of the networks' boards of directors—boards consisting of Member Banks—continually reaffirmed them. These Restraints were adopted for the purpose and effect of inflating interchange fees and excluding competition in the Relevant Market described in this Complaint. And by implementing and enforcing these rules, Visa and Mastercard fully insulated themselves from any competitive threat. It is the cardholder who selects which card to use in making a purchase; the Honor-All-Cards Rules, No-Surcharge Rules, and other Restraints therefore guarantee that the consumer will make this selection without regard to the cost of accepting the card. The consumer could not know how expensive his or her chosen

card was to the merchant, because the Challenged Restraints ensure that the costs of the transaction will be borne by the merchant, without his or her knowledge.

119. Take away the Challenged Restraints that make Defendants' default fees effectively nonnegotiable, and the Bank Defendants and other issuing banks would have to compete for merchant acceptance—offering lower interchange fees, more favorable acceptance terms, reduced fraud or chargeback risk, and the like. Merchants would be able to negotiate directly, or through acquiring banks and processors acting on their behalf, for competitive pricing and terms. Issuing banks would differentiate themselves not just on cardholder rewards and features but on what they charge merchants for acceptance, and acquiring banks and processors would have reason to help merchants cut acceptance costs rather than enforce network pricing rules. Interchange fees, in that world, would track market forces rather than a collectively imposed schedule — and competition among issuing banks for merchant acceptance would push merchant costs down while preserving or growing what cardholders receive.

120. The same is true for network fees. Take away the Challenged Restraints that insulate Visa and Mastercard from competitive pressure on the fees they charge merchants directly, and the networks would have to compete for merchant acceptance—offering lower assessments, reduced per-transaction charges, and more favorable terms. Merchants would be able to negotiate directly, or through acquiring banks and processors acting on their behalf, for competitive pricing on the network fees that today are largely take-it-or-leave-it propositions. Competing networks would have reason to undercut Visa and Mastercard on price, and new entrants could gain market share by offering lower-cost alternatives. Network fees, in that world, would track market forces rather than the supracompetitive rates that Visa and Mastercard impose today—and competition among networks for merchant acceptance would push the total fees merchants pay down to competitive levels.

121. That is not what happens. The default interchange fee schedules and the Challenged Restraints built around them eliminate competition among Visa, Mastercard, and the Bank Defendants for merchant acceptance and render interchange fees and network fees effectively non-

negotiable, leaving merchants to pay supracompetitive fees without the benefit of price competition. Merchants paid hundreds of billions of dollars in supracompetitive interchange fees over the Class Period, a continuing overcharge traceable to Defendants' anticompetitive conduct.

122. There are no countervailing benefits on the cardholder side of the Relevant Market that outweigh the competitive harms that the Challenged Restraints inflict on the merchant side of the Relevant Market. Even cardholders who earn rewards receive nothing close to what the supracompetitive interchange fees cost merchants. The Challenged Restraints cut off merchants' ability to steer consumers toward lower-cost payment methods and largely eliminate merchants' ability to offer discounts, price differentials, or other incentives tied to a particular issuing bank, network, or transaction—the kind of offers a competitive market would produce. The Restraints thus all but eliminate normal competitive processes for interchange and network fees on the merchant side of the market, leading to across-the-board inflated fees for all merchants that accept Defendants' cards.

123. Strip away the Challenged Restraints, meanwhile, and issuing banks would still have every incentive to compete for cardholders—through rewards, pricing, and innovation funded by their other substantial revenue streams, interest income and cardholder fees among them. Moreover, absent a per-transaction supracompetitive tax on every credit card swipe, issuing banks would have incentives to compete for cardholders along additional dimensions beyond rewards centered on maximizing supracompetitive swipe fees—including lower APRs, better terms, and new and innovative products. It is due only to the Challenged Restraints—including the Honor-All-Cards Rule and No-Surcharge Rule—that the two-sided market is *prevented* from reaching its natural competitive equilibrium between the cardholder and merchant sides of the market.

124. Furthermore, none of these supposed cardholder benefits justify Visa and Mastercard's inflated network fees—which amount to a supracompetitive tax on both sides of the Relevant Market. By taking an outsized cut, untethered from their costs, from both merchants and Member Banks on each transaction, Visa and Mastercard extract a per-transaction toll from the Relevant Market. Accordingly, even if the Bank Defendants and other issuing banks competed

away some of their supracompetitive profits through cardholder rewards, Visa and Mastercard's inflated fees make sure that the net effect of the Challenged Restraints is price-inflationary across both sides of the market.

125. The net effect is straightforward: with the Challenged Restraints in place, credit card transactions carry a higher "combined price" across both sides of the payment platform than they would absent the Challenged Restraints. Put another way, the price of a credit card transaction—accounting for both the fees merchants pay and the rewards cardholders receive—exceeds what a competitive market would produce. The restraints reduce output as well: less merchant acceptance, lower transaction volume at the merchants affected, and less investment and innovation in lower-cost payment alternatives.

126. None of this—the default interchange fees or the Challenged Restraints that render them effectively nonnegotiable—is reasonably necessary to any legitimate procompetitive end. Rather than balancing a two-sided platform, the fees are set to maximize Defendants' profits by discouraging issuing banks from competing, and by shifting costs—fraud risk and cardholder default among them—onto merchants. Card issuance would remain profitable without collectively fixed interchange fees, given how much revenue issuing banks already draw from interest and cardholder fees; and, as discussed next, Visa and Mastercard's own credit card networks operate efficiently in other jurisdictions under materially less restrictive rules and substantially lower interchange levels. Indeed, it is the Honor-All-Cards Rules, No-Surcharge Rules, and other Challenged Restraints that *prevent*, rather than enable, the two-sided Relevant Market from finding an efficient balance. Even if some iteration of these Network Rules were justified, Defendants' Challenged Restraints go further than necessary and foreclose less restrictive alternatives.

### F. Experiences From Outside of the United States Demonstrate That Defendants' Practices Are Anticompetitive

127. Competition and regulatory authorities in several jurisdictions around the globe have concluded that the Challenged Restraints and their international analogues are anticompetitive and illegal. As a result of these findings, Defendants have been forced to change

their practices—to decrease their interchange fees and to allow greater competition for merchant acceptance. And without exception, when Visa, Mastercard, and other networks have lowered their fees or loosened their rules, merchants have benefited while the networks have continued to thrive and even grow.

128. In 2007, for example, the European Commission ruled after an extensive investigation that Mastercard's uniform schedule of default interchange fees violated what is now Article 101 of the Treaty on the Functioning of the European Union—the EU's equivalent to Section 1 of the Sherman Act. The Commission's ruling was affirmed both by the EU's General Court and again by the Court of Justice of the European Union—the highest court in the European Union.

129. The court agreed with the Commission that Mastercard's default interchange fees harmed competition by "limiting the pressure which merchants can exert on acquiring banks when negotiating the merchant-discount fee by reducing the possibility of prices dropping below a certain threshold, in contrast with an acquiring market operating without them." Case C-382/12 P, *Mastercard v. Comm'n*, ECLI:EU:C:2014:2201, ¶ 193 (Sept. 11, 2014) (internal quotations omitted).

130. The court also concluded that Mastercard's IPO did not affect its status as an "association of undertakings"—the EU's equivalent to the Sherman Act's "contract, combination, or conspiracy" element—because when interchange fees and Rules are set, the banks "intend or at least agree to coordinate their conduct by means of those decisions," and the decisions on interchange fees and the Rules have "the same objective of joint regulation of the market within the framework of the same organisation, albeit under different forms."

131. After its decision against Mastercard, the Commission opened a similar investigation into Visa's default interchange fees and preliminarily concluded that Visa's interchange fees also harm competition. In response to the Commission's objections, Visa Europe committed in 2010 to cap its interchange fees on debit cards at 0.2% and made a similar commitment in 2014 to cap its credit card interchange fees at 0.3%.

132. In 2015, the European Parliament capped interchange fees for bank-card networks (i.e., Visa and Mastercard) at 0.2% for debit cards and 0.3% for credit cards. After Defendants' interchange fees were capped, merchants paid drastically lower prices to accept credit cards, relative to before the various decisions and legislation. At the same time, card issuance continued to be profitable and only increased—demonstrating that interchange fees at today's levels are not necessary to operate a credit card network.

133. The Reserve Bank of Australia ("RBA") has also extensively investigated its domestic payment card industry. In 2003, as a result of that investigation, the RBA ordered Visa and Mastercard to reduce domestic interchange fees by nearly half—from an average of 95 basis points (0.95%) before the reforms to approximately 50 basis points today. The RBA also required that Visa and Mastercard repeal their rules against merchant surcharging and secured an agreement from American Express to voluntarily repeal its prohibition against surcharging.

134. Before the RBA's reforms, the networks predicted that any significant reduction in interchange fees would lead to disaster—Mastercard going so far as to assert that the reforms would initiate a "death spiral" leading to the collapse of both payment card issuance and acceptance. Contrary to the networks' doomsday predictions, however, the payment card market in Australia has prospered after the reforms: the data since the reforms indicate that card issuance and transaction volumes are up, total costs to merchants and cardholders have gone down, and banks remain profitable.

135. Australian merchants have benefited substantially from reductions in the interchange fee. When interchange fees were reduced in Australia, Mastercard CEO Robert Selander explained: "There was a transfer of wealth annualized at about . . . $500 million a year into the merchant community out of the bank community . . . ." This reduction in merchant fees exceeded the sum of increases in cardholder fees and decreases in cardholder rewards.

136. Payment card markets in Australia have also benefited from merchants' ability to surcharge. As of 2014—by which point merchants had had the ability to surcharge for over a decade—the RBA reported that 43 percent of merchants imposed surcharges on at least some

payment card transactions. Large merchants were the most likely to surcharge, but even small merchants took advantage of their freedom to do so; and many large Australian merchants that do not surcharge have used the threat of surcharging to negotiate lower interchange fees or merchant-discount fees.

137. The beneficial effect of surcharging to competition is most apparent from an examination of American Express, which is not subject to the RBA's rate reductions. According to the RBA's 2016 review of its payment card reforms, American Express decreased its merchant-discount rates from approximately 2.5% before the reforms to 1.6% after—a larger drop than Visa or Mastercard experienced after their fees were regulated.

138. In addition to putting downward pressure on payment-card acceptance costs, the RBA concluded that its reforms—including the mandated reforms to the Network Rules—resulted in increased transparency, which in turn has improved merchants' bargaining position vis-à-vis the networks and issuers, thereby resulting in lower card-acceptance costs.

139. Experiences from other countries with payment card networks that function with zero or minimal interchange fees further establish the specious nature of Defendants' "death spiral" argument.

140. In 2006, the New Zealand Commerce Commission issued a Statement of Claim alleging that Visa and Mastercard's uniform schedules of default interchange fees constituted unlawful price fixing. In 2009, the Commission settled with Visa and then Mastercard on terms that allowed issuers to set their own interchange fees, subject to network-established maximum rates. Critically, the settlement also allowed merchants to surcharge credit card transactions by network (e.g., all Visa or Mastercard cards), by product (e.g., all "premium" credit cards), or by issuer. This arrangement enabled merchants to negotiate bilateral interchange fees with issuers and accordingly gave issuers an incentive to compete for merchant acceptance. In its 2013 evaluation of the 2009 settlement the Commerce Commission found that retailers had saved more than $70 million in interchange fees, and Commission Chairman Dr. Mark Berry observed: "The ability to surcharge also enhances the retailer's ability to negotiate lower fees for accepting credit

cards from their banks. That is, retailers may be able to negotiate lower fees, therefore making it unnecessary to surcharge at all."

141. The New Zealand settlement demonstrates that the Defendants are willing and able to permit merchants to steer cardholders to cost-effective payment methods—including doing so by issuer—while maintaining profitability. Since the time of the settlement, payment card networks and issuers have continued to thrive.

142. In addition to the experiences after payment card reforms in Europe, Australia, and New Zealand, more evidence that uniform schedules of default interchange fees are unnecessary to the effective functioning of a payment card network may be found in Canada, Norway, Finland, Germany, Denmark, and the Netherlands, where national debit card networks function effectively without interchange fees. Until Visa acquired Interlink and imposed an interchange fee, regional PIN-Debit networks in the United States functioned efficiently without an interchange fee.

### G. Merchants Are Direct Purchasers of Card Processing Services and Directly Pay Interchange and Network Fees

143. Merchants, and not their acquiring banks, directly pay interchange fees to the Bank Defendants and network fees to Visa and Mastercard. Both interchange and network fees are charged directly to merchants and deducted directly from the total that merchants receive. Acquiring banks do not negotiate these fees or remit these fees directly to issuers or networks. Merchants, meanwhile, pay these fees directly as a cost of card acceptance. As a matter of both form and function, merchants are the direct purchasers of card processing services and the direct payors of interchange and network fees.

144. When a cardholder uses a payment card to purchase a good or service from a merchant, the merchant's acquiring bank transmits the transaction over the network to the issuing bank, which deducts the interchange fee from the amount owed to the merchant. The acquiring bank does not pay the interchange fee because the cost of the fee is taken directly from the amount owed to the merchant. Because the issuing bank sends the acquiring bank the amount of the purchase minus the interchange fee, and the acquiring bank remits that amount to the merchant

minus additional fees, it is not the acquiring bank that pays the fee. Instead, acquiring banks are simply facilitating the provision of card-acceptance services to merchants.

145. Defendants' own documents and testimony confirm that merchants—not acquiring banks—pay interchange fees. Mastercard's 2016 10-K states, "Interchange rates are a significant component of the costs that merchants pay in connection with the acceptance of payment cards." Visa's internal documents state that interchange agreements "enable[] Visa to charge a specific rate to a specific merchant." *See Payment Card*, 2024 WL 1014159, at *16. The Bank Defendants have made similar statements, including witness testimony that merchants pay interchange fees. The applicable interchange fee varies based on the characteristics of the merchant and the nature of that merchant's transactions—not the characteristics of the acquiring bank. Interchange fees also depend on the merchant's business category, transaction volume, and whether the card is present at the point of sale. These facts demonstrate that merchants, rather than acquiring banks, are the direct purchasers of card-acceptance services. *Id.* at *17.

146. Banks' and merchants' accounting treatment of these fees confirms the economic reality. Issuing banks record interchange fees as revenue—noninterest income recognized "at the time of purchase." Merchants treat interchange fees and network fees as business expenses. Acquiring banks, in contrast, account for interchange fees neither as revenue nor as an expense; they treat interchange fees as "contra-revenue"—a charge that merchants bear in full. This accounting treatment reflects the economic substance of the transaction: the fact that some merchant-acquirer agreements and network rules state that acquirers "pay" interchange fees does not mean that acquirers directly pay those fees "as an economic and factual matter." *Id.* at *16 (citing *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 373 (3d Cir. 2005) (noting that courts look to the "economic substance of the transaction")).

147. Similarly, acquiring banks do not pay Visa and Mastercard's network fees, which are charged directly to merchants—both on a per-transaction basis, as with swipe fees, and on a fixed basis, as with FANF—without acquirers remitting any funds to the networks themselves. The Bank Defendants' documents reveal that acquiring banks do not negotiate the network fees

charged to merchants and do not account for network fees as expenses, while merchants account for network fees as a direct cost of card acceptance. *Id.* at *17.

148. Moreover, even if acquiring banks did directly pay the challenged fees—they do not—acquiring banks are themselves members of the Visa and Mastercard cartels, co-conspirators in Defendants' scheme, and beneficiaries of the inflated fees. Most are owned or controlled by the issuing banks, including the Bank Defendants, and are themselves card-issuing banks. Each of those banks is a single legal entity that fulfills two roles in the network, by both issuing cards and acting as an acquirer for merchants (including, sometimes, fulfilling both roles on a single transaction).

149. The Visa and Mastercard Rules require that a Member Bank be a party to all or nearly all merchant contracts for the acceptance of Visa and Mastercard credit cards—a requirement that reaches even merchants and banks using "Payment Facilitators." This requirement means, in effect, that all merchant contracts to accept Defendants' cards and networks must include an acquirer that is itself a Member Bank that has agreed to follow the Network Rules, including the Honor-All-Cards Rules, No-Surcharge Rules, and the other Challenged Restraints.

150. Before the IPOs, the Member Banks appointed the networks' boards of directors and approved of, and agreed to abide by, the networks' rules and bylaws. Before the IPOs, too, the Member Banks conspired with each other and with Visa and Mastercard to collectively fix uniform schedules of default interchange fees and use the Challenged Restraints to enforce those default fees. And at all times relevant to these claims, the Member Banks have agreed to abide by the Rules of Visa and Mastercard.

151. Moreover, Member Banks that operate as acquirers almost all operate as, or are owned or controlled by banks operating as, card-issuing banks as well. Indeed, for Member Banks, issuance itself is mandatory. The bylaws of Defendant Visa U.S.A. required that all "Principal Member [Banks]"—a group that included the Bank Defendant members of Visa U.S.A. and the vast majority of all Member Banks—"[s]hall issue Cards bearing the Visa service mark."

Visa U.S.A., Bylaws § 2.04(a) (May 15, 2004). Visa continues to interpret its rules to require Member Banks to issue payment cards. Mastercard's Rule 3.1 similarly requires that Member Banks "must have issued and outstanding a reasonable number of Mastercard Cards," and a Member Bank that fails to issue the requisite number of cards will be assessed a penalty by Mastercard.

152. The reason for these provisions is for all Member Banks to have a common economic interest in ever-rising interchange fees. Because every Member Bank is required to issue Visa or Mastercard payment cards, every Member Bank benefits from the supracompetitive interchange fees that the banks agree to abide by and prop up.

153. Today, virtually every large acquiring bank is also a large issuer of Visa- and Mastercard-branded cards—including Bank Defendants Chase, Wells Fargo, and Bank of America. Acquiring banks thus not only have no incentive to sue over but are also in fact the key beneficiaries and perpetrators of, and co-conspirators in, Defendants' scheme to artificially inflate interchange, network, and merchant-discount fees.

154. Further, even if acquiring banks did have any incentive to sue over their own supracompetitive interchange fees (they do not), they have contractually agreed not to do so. Under Visa Inc.'s Core Rule 1.1.8.1, Member Banks are solely responsible for their "issuance of Visa products and acquiring of Merchants to accept Visa products, including responsibility for settlement of Transactions [and] compliance with the Visa Charter Documents and the Visa Core Rules and Visa Product and Service Rule . . . ." The same Rule further specifies that Member Banks "[i]ndemnify Visa for and against Claims and Liabilities arising out of or in connection with its issuance of Visa products and acquiring of Merchants, and broadly disclaim[] liability against Visa for such activities." The upshot is that if a Visa Member Bank determined that the uniform schedules of default interchange fees harmed it, Core Rule 1.1.8.1 would prevent it from suing Visa.

155. Mastercard's Rule 2.3 states that "IN NO EVENT WILL THE CORPORATION BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL

DAMAGES, FOR LOSS OF PROFITS, OR ANY OTHER COST OR EXPENSE INCURRED BY A CUSTOMER OR ANY THIRD PARTY ARISING FROM OR RELATED TO USE OR RECEIPT OF THE SYSTEMS, WHETHER IN AN ACTION IN CONTRACT OR IN TORT . . . ." (capitalization in original). So if a Mastercard Member Bank determined that the uniform schedules of default interchange fees harmed it, Rule 2.3 would prevent it from suing Mastercard.

156. And in a technical manual issued to its Member Banks, Mastercard stated that "Mastercard shall have no liability to any member, member processor, or other person acting on behalf of the member for any loss, cost, or other damage arising out of or in connection with Mastercard's administration of or any member's participation in any interchange rate program." Mastercard Int'l, GCMS Reference Manual.

## V. RELEVANT MARKET

157. Defendants' conduct affects a relevant product market for general purpose credit card network services. The geographic dimension of this relevant market is no broader than the United States.

### A. The United States Is a Relevant Geographic Market

158. The United States is a relevant geographic market. Federal laws and regulations that govern credit card transactions operate at the national level. Visa and Mastercard organize their United States credit card businesses at the national level, as demonstrated by their separate rules governing merchant acceptance in the United States and their separate pricing of credit card network services for merchants in the United States. The other parties to a credit card transaction—consumers, issuers, acquirers, and merchants—could not practicably turn to credit card network services offered elsewhere as alternatives. Therefore, a firm that was the only seller of general purpose credit card network services in the United States would be able to profitably maintain prices above the level that would prevail in a competitive market.

### B. General Purpose Credit Card Network Services Are a Relevant Product Market

159. General purpose credit card network services facilitate a cardholder's use of his or her line of credit with an issuing bank to make immediate purchases at a point of sale using a card or device. Defendants provide products and services that enable credit transactions. They compete to offer these network services on a broad scale, meaning their services can be used at numerous unrelated merchants. These networks simultaneously market their services to issuers and acquirers. Acting as intermediaries, they operate two-sided platforms, allowing transactions between merchants and accountholders. Collectively, these services represent a relevant product market.

160. Credit card networks, such as Visa and Mastercard, offer a suite of services essential for executing credit card transactions, consumed jointly by merchants and accountholders (alongside acquirers and issuers). These offerings include the capacity for consumers or their banks to dispute and chargeback transactions, payment guarantees for merchants, fraud protection, and the network that facilitates communication between parties, promptly transferring funds from a consumer's bank to a merchant's bank. These fundamental attributes distinguish credit card transactions from other payment methods and are crucial for merchants, consumers, and banks alike.

161. Credit card networks function as two-sided platforms with high interdependence between accountholders and issuers on one side and merchants and acquirers on the other. The network becomes more valuable to accountholders and issuers as it connects with more merchants, and likewise, it becomes more beneficial to merchants and acquirers when it links to more accountholders.

162. There are very high barriers to entry in the general purpose credit card network services market. Since 1985, only Discover has entered the relevant market, and its market share has never exceeded 5%.

163. Under antitrust laws, general purpose credit card network services form a relevant product market. Many consumers do not consider other payment options suitable substitutes for credit cards. Recognizing their accountholders' preference for credit cards, issuers also do not see alternative payment services as viable replacements. Merchants value credit cards because they do

not wish to lose sales by refusing to accept a widely preferred payment method. Acquirers, aware of their merchants' reliance on credit cards, similarly do not view alternative payment services as suitable substitutes. Therefore, there are no reasonable substitutes for general purpose credit card network services, and a single firm dominating this market could profitably maintain prices above competitive levels.

164. Economists typically define markets for antitrust purposes with reference to the "SSNIP" test, asking whether a hypothetical monopolist of a particular product (or service) could impose a "small but significant and non-transitory increase in price" above the competitive level on that product (typically, on the order of 5-10%) without losing sufficient customers to render the price increase unprofitable.

165. A hypothetical monopolist of all credit card network services would easily be able to increase the price of credit card transactions to merchants by 5-10% without losing sufficient business to render the SSNIP unprofitable. Likewise, the hypothetical monopolist could increase the "two-sided price" of credit card transactions (defined as the price imposed upon merchants minus the rebates or other value provided to cardholders) by 5-10% without losing sufficient business to render the SSNIP unprofitable.

166. General purpose credit card network services are not directly interchangeable with debit services, as debit payments draw directly from a consumer's bank account rather than a line of credit. This distinction is well-acknowledged in the payments industry, and Defendants, along with other networks, have separate pricing for credit and debit transactions.

167. Courts have recognized that credit card and debit card services are distinct products based on differences in demand and functionality. *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568, at *3 (E.D.N.Y. Apr. 1, 2003) ("[N]o rational juror could fail to conclude that the [credit and debit] products are distinct."). Market behavior confirms the distinction. When the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 directed the Federal Reserve to limit debit card interchange fees to amounts "reasonable and proportional" to the cost of processing, Visa and Mastercard did not reduce credit

card interchange fees, and credit card transaction volume did not decline. This lack of cross-elasticity confirms that debit services do not constrain the price of general purpose credit card network services.

168. Cash and checks do not offer a reasonable substitute for credit card network services. Merchants and accountholders alike do not view cash or check payments as equivalent to credit card transactions due to the differences in up-front capital needs, processing procedures, payment risk, and costs.

## VI. MARKET POWER

169. At all relevant times, Visa has had market power in the general purpose credit card network services market. The Challenged Restraints ensure that merchants cannot use the tool of price to induce their customers to use credit cards other than Visa's. During the Class Period, Visa has had, and has exercised, the power to maintain prices for credit card transactions substantially above competitive levels. At present, roughly 61% of all spending on credit cards in the U.S. is on Visa-branded cards.

170. At all relevant times, Mastercard has had market power in the general purpose credit card network services market. The Challenged Restraints ensure that merchants cannot use the tool of price to induce their customers to use credit cards other than Mastercard's. During the Class Period, Mastercard has had, and has exercised, the power to maintain prices for credit card transactions substantially above competitive levels. At present, roughly 26% of all spending on credit cards in the U.S. is on Mastercard-branded cards.

171. Collectively, Visa and Mastercard account for roughly 87% of all credit card volume in the United States.

172. The practical realities of credit-card acceptance in the United States further demonstrate the market power that each of Visa and Mastercard possesses, above and beyond their substantial market shares. Due to the large number of cardholders that exclusively use Visa- or Mastercard-branded cards to conduct credit card transactions (a number that is enhanced by Visa and Mastercard Rules prohibiting card issuance bearing the marks of both networks), each network

achieves "must-have" status for merchants: a merchant cannot profitably accept only Visa or Mastercard cards without losing a significant share of business, as evidenced by the fact that vanishingly few merchants in the United States accept only one of the two networks. This suggests that the two networks are not functionally substitutable at the merchant-relationship level such that they can constrain each other's pricing decisions.

173. Moreover, even if the networks *could* constrain each other's pricing decisions at the *transaction* level, the Challenged Restraints ensure that they will not do so. Because the Challenged Restraints prevent merchants from using price to steer consumers to lower-cost transactions—and thus prevent both the networks and their Member Banks from having any incentive to compete on total merchant-discount fees—the Challenged Restraints, including the Honor-All-Cards and No-Surcharge Rules, work together to effectively eliminate competition between networks at the transaction level.

174. Further, as noted above, most large issuing banks—including the Bank Defendants—issue significant numbers of *both* Visa- and Mastercard-branded credit cards. Accordingly, *even if* the Challenged Restraints did not eliminate the incentives for issuing banks to compete on interchange fees, the fact that the same issuers stand to benefit from inflated prices across both networks—and gain nothing from competing against themselves—further reinforces and bolsters Visa and Mastercard's market power.

175. The fact that merchants continue to accept both Visa- and Mastercard-branded credit cards *en masse* despite the anticompetitive, price-inflationary nature of the Challenged Restraints further demonstrates that merchants view each network as necessary—in other words, that each network has market power.

## VII. PLAINTIFF AND THE CLASS HAVE BEEN INJURED BY DEFENDANTS' CONDUCT

176. Defendants' anticompetitive conduct has caused injury to Plaintiff and the Class. As a result of Defendants' anticompetitive conduct and the Challenged Restraints, Class members have paid and continue to pay supracompetitive interchange fees, network fees, and merchant-

discount fees. These injuries flow directly from the competitive harm inflicted by Defendants' conduct, and the injuries to Plaintiff and the Class are inextricably intertwined with Defendants' anticompetitive scheme, which specifically aims to inflict higher costs on merchant transactions.

177. As a result of Defendants' anticompetitive conduct, throughout the Class Period and until the present, Defendants imposed higher fees on Class members than they would have been able to impose in a competitive market. Each credit card transaction routed through Visa or Mastercard thus constituted a new overt act causing injury to the Class.

178. The anticompetitive conduct alleged herein, including the use of the Challenged Restraints to impose and maintain supracompetitive merchant fees, has continued uninterrupted since the Damages Settlement and throughout the Class Period defined below. Each credit card transaction processed under those rules inflicts a new and independent antitrust injury on Plaintiff. Moreover, Defendants have continued to update, ratify, and enforce the Network Rules, including the Challenged Restraints, throughout the Class Period. Defendants' continued promulgation and enforcement of the Challenged Restraints, and their continued imposition of the Challenged Restraints on every credit card transaction processed pursuant to the Network Rules, is therefore a continuing violation, and each supracompetitive merchant charge starts a new limitations period as to the damages caused by that charge.

179. As the direct consumers of credit card network services, Plaintiff and the members of the Class are the efficient enforcers to redress these injuries. Acquiring banks and other transaction facilitators do not pay interchange fees or network fees directly to Defendants. Rather, when a member of the Class accepts a credit card transaction, the Class member pays network fees directly to Visa and Mastercard and interchange fees directly to issuing banks. Acquiring banks and other transaction facilitators do not pay these fees to Defendants.

180. Payment of overcharges by way of Defendants' supracompetitive fees represents precisely the type of injury the antitrust laws were intended to prevent, as Defendants' ability to impose these overcharges flows directly from their anticompetitive restraints on the general purpose credit card network services market. Plaintiff and Class members directly participate in

that market and suffer injury from the fees Defendants withdraw from money they are owed on credit card transactions. This harm can be easily and concretely measured based on the fees deducted from Class members' accounts.

181. There is no risk of speculative or duplicative recovery, nor is there any need to apportion damages, for the only entities with overcharge injuries under federal antitrust law are the members of the Class. Importantly, moreover, many acquiring banks and payment processing platforms agreed to, participated in, and benefited from Defendants' restraints, as alleged above, meaning that even if any challenged fees are paid through those entities, they represent fees paid to participants in Defendants' unlawful conduct.

182. Given that Class members are the targets of Defendants' anticompetitive conduct, they are the entities most directly and proximately injured by Defendants.

## VIII. CLASS ACTION ALLEGATIONS

183. **Class Definition:** Plaintiff brings this action on behalf of itself and under Federal Rule of Civil Procedure 23(a) and (b)(3), as representative of a nationwide class defined as:

> All persons, businesses, and other entities that have accepted Visa-branded and/or Mastercard-branded credit cards in the United States from January 25, 2019, until the anticompetitive effects of Defendants' conduct cease. This Class does not include the named Defendants, their directors, officers, or members of their families, or their co-conspirators or financial institutions that have issued Visa- and/or Mastercard-branded credit cards or acquired Visa-branded and/or Mastercard-branded credit card transactions or the United States Government. This Class also does not include persons, businesses, or other entities whose claims otherwise pled in this Complaint have been lawfully released.

184. Plaintiff also brings this action on behalf of itself and under Federal Rule of Civil Procedure 23(a) and (b)(3) as a representative of a nationwide subclass under California law. The anticompetitive policies and conduct alleged herein emanated from Visa's headquarters in California and adversely affected Class members across the nation.

185. Alternatively, Plaintiff also brings this action on behalf of itself and under Federal Rule of Civil Procedure 23(a) and (b)(3) as representative of a subclass under California law and/or

the laws of the several states and territories set forth below for Class members with business operations in any of those states and territories.

186. **Numerosity:** The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members, but the above-defined class is readily identifiable and is one for which records should exist in Defendants' files. Plaintiff believes that due to the nature of the product market, there are millions of members of the Class in the United States.

187. **Typicality:** The representative Plaintiff's claims and the defenses to those claims are typical of the claims and defenses of absent Class members. The representative Plaintiff is a merchant that accepted Defendants' credit cards after January 24, 2019 and is therefore situated similarly to other Class members. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

188. **Adequacy:** The representative Plaintiff will fairly and adequately represent the interests of the Class because its individual interests are consistent with, and not antagonistic to, the interests of the other Class members. Moreover, Plaintiff is represented by counsel who have the ability and financial means to prosecute this case as a class action and are experienced antitrust and class action attorneys who have successfully litigated other cases involving similar issues, including in class actions.

189. **Common Questions Predominate:** There are questions of fact and law that are common to the Class and predominate over any questions affecting only individual class members, including:

a. Whether Visa entered into contracts, combinations or conspiracies to fix, raise, elevate, maintain or stabilize the fees for services provided in the Relevant Market;

b. Whether Mastercard entered into contracts, combinations or conspiracies to fix, raise, elevate, maintain or stabilize the fees for services provided in the Relevant Market;

c. Whether the Bank Defendants entered into contracts, combinations or conspiracies to fix, raise, elevate, maintain or stabilize the fees for services provided in the Relevant Market;

d. Whether the general purpose credit card network services market alleged above constitutes a relevant antitrust market;

e. Whether Visa has market power in the general purpose credit card network services market;

f. Whether Mastercard has market power in the general purpose credit card network services market;

g. Whether Defendants' conduct has inflated the fees that merchants must pay to accept Visa and Mastercard credit cards;

h. Whether Visa's conduct alleged in this Complaint violated the Sherman Act;

i. Whether Visa's conduct alleged in this Complaint violated the state statutes listed below;

j. Whether Mastercard's conduct alleged in this Complaint violated the Sherman Act;

k. Whether Mastercard's conduct alleged in this Complaint violated the state statutes set forth below;

l. Whether the Bank Defendants' conduct alleged in this Complaint violated the Sherman Act;

m. Whether the Bank Defendants' conduct alleged in this Complaint violated the state statutes set forth below;

n. The amount of additional fees the Class incurred by reason of Visa's violations of the antitrust laws; and

o. The amount of additional fees the Class incurred by reason of Mastercard's violations of the antitrust laws.

p. The amount of additional fees the Class incurred by reason of the Bank Defendants' violations of the antitrust laws.

190. **Superiority:** Class action litigation under Rule 23(b)(3) is superior to any alternative means of resolving this controversy. The compensation to each individual Class member is small in relation to the expense and burden that would be required to recover that compensation in individual litigation. Indeed, for many Class members, a class action is the only economically feasible means of seeking redress for the violations alleged herein.

## IX. CAUSES OF ACTION

### COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1), Unlawful Price-Fixing by Visa and the Bank Defendants

191. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

192. Visa has and exercises market power in the Relevant Market.

193. The Member Banks of Visa, including the Bank Defendants—direct, horizontal competitors of each other—engaged in unlawful contracts, combinations, and conspiracies among themselves and with Visa in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

194. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Visa's issuing and acquiring members, including the Bank Defendants and Visa, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the credit card interchange fees that are imposed on merchants in the Relevant Market.

195. The Visa Board of Directors, which for much of the relevant time period included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the interchange fees for Visa transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

196. All of the Member Banks of Visa, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

197. The contracts, combinations, and conspiracies alleged herein began before Visa's 2008 IPO and have continued after that date. Even after Visa's IPO, the Bank Defendants'—and other banks'—membership in Visa is contingent upon those banks agreeing to adhere to the anticompetitive rules that render the uniform schedule of default interchange fees described herein effectively mandatory. Even after Visa's IPO, each Member Bank agrees to adhere to Visa's network rules and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default interchange fees.

198. No Defendant has taken any step to withdraw from these conspiracies at any time before or since the restructurings.

199. In addition, each of Visa's agreements with individual Member Banks, including the Bank Defendants, requiring those banks to adhere to the Challenged Restraints constitutes a hub-and-spoke conspiracy in which Visa is the hub and each Member Bank is a spoke. Each Member Bank's agreement to abide by the Challenged Restraints is made with the knowledge and expectation that every other Member Bank has agreed to the same terms—knowledge that furnishes the rim of the conspiracy. It would be disadvantageous for any Member Bank to adhere to the Challenged Restraints unless it possessed knowledge that all other similarly situated banks would also adhere to those same restraints. Indeed, it would be plainly contrary to the economic self-interest of a Member Bank to independently agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from steering purchasers to its cards. These agreements, individually and collectively, constitute contracts, combinations, or conspiracies to fix prices in violation of Section 1 of the Sherman Act.

200. The contracts, combinations, conspiracies, and agreements alleged in this Count have had, and are likely to continue to have, among other things, the following anticompetitive effects which are common to Plaintiff and the Class: (a) actual and potential competition in the Relevant Market was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained; (b) Defendants acquired and maintained market power in the Relevant Market; (c) Defendants controlled, maintained, and elevated above

competitive levels the merchant fees imposed on Class members in the Relevant Market; (d) all Class members were required to pay supracompetitive credit card merchant fees for Visa transactions in the Relevant Market; (e) Defendants derived direct and substantial economic benefits from the supracompetitive credit card merchant fees for Visa transactions in the Relevant Market; (f) but for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the merchant fees for Visa transactions in order to gain business from merchants; and (g) but for the anticompetitive conduct of Defendants, Class members would have saved billions of dollars by avoiding or mitigating Defendants' supracompetitive interchange and network fees.

201. The Challenged Restraints and use of those restraints to enforce effectively mandatory interchange and network fees constitute an illegal agreement to fix the price of acceptance of Visa credit cards and to interfere with the competitive process with respect to the acceptance of Visa credit cards, in violation of Section 1 of the Sherman Act. The price-fixing conspiracy and agreements among competitors not to compete were *per se* violations of Section 1.

202. As a direct and proximate result of these violations, Plaintiff and Class members have been injured in their business and property. Plaintiff and Class members are entitled to recover treble damages, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial.

**COUNT II**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1),**
**Unlawful Price-Fixing by Mastercard and the Bank Defendants**

203. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

204. Mastercard has and exercises market power in the Relevant Market.

205. The Member Banks of Mastercard, including the Bank Defendants—direct, horizontal competitors of each other—engaged in unlawful contracts, combinations, and

conspiracies among themselves and with Mastercard in an unreasonable restraint of interstate trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

206. The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings, and concerts of action between and among Mastercard's issuing and acquiring members, including the Bank Defendants and Mastercard, the substantial terms of which were to illegally fix, raise, maintain, or stabilize the credit card interchange fees that are imposed on merchants in the Relevant Market.

207. The Mastercard Board of Directors, which for much of the relevant time period included representatives from several Bank Defendants, acted on behalf of the Member Banks to fix, raise, maintain, or stabilize the interchange fees for Mastercard transactions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

208. All of the Member Banks of Mastercard, including the Bank Defendants, have actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

209. The contracts, combinations, and conspiracies alleged herein began before Mastercard's 2006 IPO and have continued after that date. Even after Mastercard's IPO, the Bank Defendants'—and other banks'—membership in Mastercard is contingent upon those banks agreeing to adhere to the anticompetitive rules that render the uniform schedule of default interchange fees described herein effectively mandatory. Even after Mastercard's IPO, each Member Bank agrees to adhere to Mastercard's network rules and knows, understands, and expects that all other Member Banks will agree to abide by the same rules and uniform schedule of default interchange fees.

210. No Defendant has taken any step to withdraw from these conspiracies at any time before or since the restructurings.

211. In addition, each of Mastercard's agreements with individual Member Banks, including the Bank Defendants, requiring those banks to adhere to the Challenged Restraints constitutes a hub-and-spoke conspiracy in which Mastercard is the hub and each Member Bank is a spoke. Each Member Bank's agreement to abide by the Challenged Restraints is made with the

knowledge and expectation that every other Member Bank has agreed to the same terms—knowledge that furnishes the rim of the conspiracy. It would be disadvantageous for any Member Bank to adhere to the Challenged Restraints unless it possessed knowledge that all other similarly situated banks would also adhere to those same restraints. Indeed, it would be plainly contrary to the economic self-interest of a Member Bank to independently agree to a supracompetitive price for its cards, or to restraints that prohibit merchants from steering purchasers to its cards. These agreements, individually and collectively, constitute contracts, combinations, or conspiracies to fix prices in violation of Section 1 of the Sherman Act.

212. The contracts, combinations, conspiracies, and agreements alleged in this Count have had, and are likely to continue to have, among other things, the following anticompetitive effects which are common to Plaintiff and the Class: (a) actual and potential competition in the Relevant Market was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained; (b) Defendants acquired and maintained market power in the Relevant Market; (c) Defendants controlled, maintained, and elevated above competitive levels the merchant fees imposed on Class members in the Relevant Market; (d) all Class members were required to pay supracompetitive credit card merchant fees for Mastercard transactions in the Relevant Market; (e) Defendants derived direct and substantial economic benefits from the supracompetitive credit card merchant fees for Mastercard transactions in the Relevant Market; (f) but for the anticompetitive conduct of Mastercard and its Member Banks, competition among banks would have eliminated or greatly reduced the merchant fees for Mastercard transactions in order to gain business from merchants; and (g) but for the anticompetitive conduct of Defendants, Class members would have saved billions of dollars by avoiding or mitigating Defendants' supracompetitive interchange and network fees.

213. The Challenged Restraints and use of those restraints to enforce effectively mandatory interchange and network fees constitute an illegal agreement to fix the price of acceptance of Mastercard credit cards and to interfere with the competitive process with respect to the acceptance of Mastercard credit cards, in violation of Section 1 of the Sherman Act. The price-

fixing conspiracy and agreements among competitors not to compete were *per se* violations of Section 1.

214. As a direct and proximate result of these violations, Plaintiff and Class members have been injured in their business and property. Plaintiff and Class members are entitled to recover treble damages, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial.

**COUNT III**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1),**
**Unreasonable Restraints of Trade by Visa and the Bank Defendants**

215. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

216. The Challenged Restraints, including the No-Surcharge Rule, the Honor-All-Cards Rules, and the other anticompetitive restraints described herein, imposed upon merchants by Visa and its Member Banks, represent unlawful contracts in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

217. Visa has and exercises market power in the Relevant Market.

218. In addition, the collective adoption and enforcement of the Challenged Restraints by Visa and its Member Banks constitute contracts, combinations, or conspiracies in unreasonable restraint of trade.

219. The Challenged Restraints are anticompetitive restraints. Among their anticompetitive effects are the inflationary pressure they exert on merchant fees, the compulsion of subsidies running from users of low-cost payment forms to users of Defendants' high-cost credit cards, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient credit card network services.

220. No procompetitive justifications exist for the Challenged Restraints. Even if some iteration of the Challenged Restraints were justified, Defendants' restraints go further than necessary and foreclose less restrictive alternatives that would achieve any claimed procompetitive benefits.

221. The contracts, combinations, conspiracies, and agreements alleged in this Count have had, and are likely to continue to have, among other things, the following anticompetitive effects which are common to Plaintiff and the Class: (a) actual and potential competition in the Relevant Market was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained; (b) Visa acquired and maintained market power in the Relevant Market; (c) Visa and its Member Banks controlled, maintained, and elevated above competitive levels the merchant fees imposed on Class members in the Relevant Market; (d) all Class members were required to pay supracompetitive credit card merchant fees for Visa transactions in the Relevant Market; (e) Defendants derived direct and substantial economic benefits from the supracompetitive credit card merchant fees for Visa transactions in the Relevant Market; (f) but for the anticompetitive conduct of Visa and its Member Banks, competition among banks would have eliminated or greatly reduced the merchant fees for Visa transactions in order to gain business from merchants; and (g) but for the anticompetitive conduct of Defendants, Class members would have saved billions of dollars by avoiding or mitigating Defendants' supracompetitive interchange and network fees.

222. As a direct and proximate result of these violations of Section 1 of the Sherman Act, Plaintiff and Class members have been injured in their business and property. Plaintiff and Class members are entitled to recover treble damages, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial.

## COUNT IV
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1), Unreasonable Restraints of Trade by Mastercard and the Bank Defendants

223. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

224. The Challenged Restraints, including the No-Surcharge Rule, the Honor-All-Cards Rules, and the other anticompetitive restraints described herein, imposed upon merchants by Mastercard and its Member Banks, represent unlawful contracts in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

225. Mastercard has and exercises market power in the Relevant Market.

226. In addition, the collective adoption and enforcement of the Challenged Restraints by Mastercard and its Member Banks constitute contracts, combinations, or conspiracies in unreasonable restraint of trade.

227. The Challenged Restraints are anticompetitive restraints. Among their anticompetitive effects are the inflationary pressure they exert on merchant fees, the compulsion of subsidies running from users of low-cost payment forms to users of Defendants' high-cost credit cards, the entrenchment of Defendants' market positions, and the insulation of Defendants from any competitive threat from a rival offering cheaper or more efficient credit card network services.

228. No procompetitive justifications exist for the Challenged Restraints. Even if some iteration of the Challenged Restraints were justified, Defendants' restraints go further than necessary and foreclose less restrictive alternatives that would achieve any claimed procompetitive benefits.

229. The contracts, combinations, conspiracies, and agreements alleged in this Count have had, and are likely to continue to have, among other things, the following anticompetitive effects which are common to Plaintiff and the Class: (a) actual and potential competition in the Relevant Market was substantially excluded, suppressed, and effectively foreclosed and thus competition has been unreasonably restrained; (b) Mastercard acquired and maintained market power in the Relevant Market; (c) Mastercard and its Member Banks controlled, maintained, and elevated above competitive levels the merchant fees imposed on Class members in the Relevant Market; (d) all Class members were required to pay supracompetitive credit card merchant fees for Mastercard transactions in the Relevant Market; (e) Defendants derived direct and substantial economic benefits from the supracompetitive credit card merchant fees for Mastercard transactions in the Relevant Market; (f) but for the anticompetitive conduct of Mastercard and its Member Banks, competition among banks would have eliminated or greatly reduced the merchant fees for Mastercard transactions in order to gain business from merchants; and (g) but for the

anticompetitive conduct of Defendants, Class members would have saved billions of dollars by avoiding or mitigating Defendants' supracompetitive interchange and network fees.

230. As a direct and proximate result of these violations of Section 1 of the Sherman Act, Plaintiff and Class members have been injured in their business and property. Plaintiff and Class members are entitled to recover treble damages, costs, and attorneys' fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, in an amount to be determined at trial.

**VIOLATIONS OF STATE ANTITRUST LAWS**

231. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

232. The following Fifth through Sixty-Sixth Counts are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiff and members of the Class.

233. Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws cited below.

**COUNT V**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. ANN. §§ 44-1401 et seq.**
**Visa and the Bank Defendants**

234. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq*.

236. Under Arizona law, "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." ARIZ. REV. STAT. ANN. § 44-1402.

237. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arizona.

238. Visa and the Bank Defendants' violations of Arizona law were flagrant.

239. Visa and the Bank Defendants' unlawful conduct substantially affected Arizona's trade and commerce, and Visa and the Bank Defendants' unlawful conduct occurred in substantial part in Arizona.

240. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

241. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq*.

**COUNT VI**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. ANN. §§ 44-1401 et seq.**
**Mastercard and the Bank Defendants**

242. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

243. By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq*.

244. Under Arizona law, "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." ARIZ. REV. STAT. ANN. § 44-1402.

245. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arizona.

246. Mastercard and the Bank Defendants' violations of Arizona law were flagrant.

247. Mastercard and the Bank Defendants' unlawful conduct substantially affected Arizona's trade and commerce, and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in Arizona.

248. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

249. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Ariz. Rev. Stat. Ann. Sections 44-1401, *et seq*.

**COUNT VII**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE §§ 16700, et seq.**
**Visa and the Bank Defendants**

250. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700, *et seq*., governs antitrust violations in California.

252. A trust in California is any combination of capital, skill or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. CAL. BUS. & PROF. CODE § 16726.

253. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Relevant Market, a substantial part of which occurred within California.

254. Visa and the Bank Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code Sections 16700, *et seq*.

255. Visa and the Bank Defendants' unlawful conduct substantially affected California's trade and commerce and Visa and the Bank Defendants' unlawful conduct occurred in substantial

part in California by fixing the prices charged to businesses for credit card network services in California.

256. Plaintiff and members of the Class purchased credit card network services within the State of California during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

257. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in California and are entitled to all forms of relief, including recovery of treble damages and interest, plus reasonable attorneys' fees and costs.

**COUNT VIII**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE §§ 16700, et seq.**
**Mastercard and the Bank Defendants**

258. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

259. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700, *et seq*., governs antitrust violations in California.

260. A trust in California is any combination of capital, skill or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. CAL. BUS. & PROF. CODE § 16726.

261. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Relevant Market, a substantial part of which occurred within California.

262. Mastercard and the Bank Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code Sections 16700, *et seq*.

263. Mastercard and the Bank Defendants' unlawful conduct substantially affected California's trade and commerce and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in California by fixing the prices charged to businesses for credit card network services in California.

264. Plaintiff and members of the Class purchased credit card network services within the State of California during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

265. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in California and are entitled to all forms of relief, including recovery of treble damages and interest, plus reasonable attorneys' fees and costs.

**COUNT IX**
**VIOLATION OF COLORADO'S ANTITRUST ACT**
**COLO. REV. STAT. §§ 6-4-104 et seq.**
**Visa and the Bank Defendants**

266. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

267. The Colorado Antitrust Act states that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal." COLO. REV. STAT. § 6-4-104.

268. Members of the Class purchased credit card network services within Colorado during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

269. Visa and the Bank Defendants contracted, combined or conspired to restrain or monopolize trade in the Relevant Market in Colorado in violation of COLO. REV. STAT. § 6-4-104.

270. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Colorado, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

**COUNT X**
**VIOLATION OF COLORADO'S ANTITRUST ACT**
**COLO. REV. STAT. §§ 6-4-104 et seq.**
**Mastercard and the Bank Defendants**

271. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272. The Colorado Antitrust Act states that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal." COLO. REV. STAT. § 6-4-104.

273. Members of the Class purchased credit card network services within Colorado during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

274. Mastercard and the Bank Defendants contracted, combined or conspired to restrain or monopolize trade in the Relevant Market in Colorado in violation of COLO. REV. STAT. § 6-4-104.

275. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Colorado, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

**COUNT XI**
**VIOLATION OF CONNECTICUT ANTITRUST ACT,**
**CONN. GEN. STAT. ANN. §§ 35-24, et seq.**
**Visa and the Bank Defendants**

276. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

277. The Connecticut Antitrust Act provides that "[e]very contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful." CONN. GEN. STAT. ANN. §

35-26. Without limiting that prohibition, the Act further declares unlawful every contract, combination, or conspiracy that has the purpose or effect of "[f]ixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce." *Id.* § 35-28(a).

278. Members of the Class purchased credit card network services within Connecticut during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

279. Visa and the Bank Defendants contracted, combined or conspired to act in restraint of trade within Connecticut in violation of Conn. Gen. Stat. Ann. §§ 35-26 and 35-28.

280. Visa and the Bank Defendants' unlawful conduct substantially affected Connecticut's trade and commerce and Visa and the Bank Defendants' unlawful conduct occurred in substantial part in Connecticut by fixing the prices charged to businesses for credit card network services in Connecticut.

281. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in Connecticut and are entitled to all forms of relief, including recovery of treble damages, and interest, plus reasonable attorneys' fees and costs.

**COUNT XII**
**VIOLATION OF CONNECTICUT ANTITRUST ACT,**
**CONN. GEN. STAT. ANN. §§ 35-24, et seq.**
**Mastercard and the Bank Defendants**

282. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

283. The Connecticut Antitrust Act provides that "[e]very contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful." CONN. GEN. STAT. ANN. § 35-26. Without limiting that prohibition, the Act further declares unlawful every contract, combination, or conspiracy that has the purpose or effect of "[f]ixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce." *Id.* § 35-28(a).

284. Members of the Class purchased credit card network services within Connecticut during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein,

the price of credit card network services would have been lower, in an amount to be determined at trial.

285. Mastercard and the Bank Defendants contracted, combined or conspired to act in restraint of trade within Connecticut in violation of Conn. Gen. Stat. Ann. §§ 35-26 and 35-28.

286. Mastercard and the Bank Defendants' unlawful conduct substantially affected Connecticut's trade and commerce and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in Connecticut by fixing the prices charged to businesses for credit card network services in Connecticut.

287. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in Connecticut and are entitled to all forms of relief, including recovery of treble damages, and interest, plus reasonable attorneys' fees and costs.

**COUNT XIII**
**VIOLATION OF DELAWARE ANTITRUST ACT,**
**DEL. CODE ANN. TIT. 6, §§ 2101, et seq.**
**Visa and the Bank Defendants**

288. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289. The Delaware Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce of [Delaware]." Del. Code Ann. tit. 6, § 2103.

290. Members of the Class purchased credit card network services within Delaware during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

291. Visa and the Bank Defendants contracted, combined or conspired to act in restraint of trade within Delaware in violation of Del. Code Ann. tit. 6, § 2103.

292. Visa and the Bank Defendants' unlawful conduct substantially affected Delaware's trade and commerce and Visa and the Bank Defendants' unlawful conduct occurred in substantial

part in Delaware by fixing the prices charged to businesses for credit card network services in Delaware.

293. Visa and the Bank Defendants' violations are willful.

294. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in Delaware and are entitled to all forms of relief, including recovery of treble damages.

**COUNT XIV**
**VIOLATION OF DELAWARE ANTITRUST ACT,**
**DEL. CODE ANN. TIT. 6, §§ 2101, et seq.**
**Mastercard and the Bank Defendants**

295. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

296. The Delaware Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce of [Delaware]." Del. Code Ann. tit. 6, § 2103.

297. Members of the Class purchased credit card network services within Delaware during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

298. Mastercard and the Bank Defendants contracted, combined or conspired to act in restraint of trade within Delaware in violation of Del. Code Ann. tit. 6, § 2103.

299. Mastercard and the Bank Defendants' unlawful conduct substantially affected Delaware's trade and commerce and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in Delaware by fixing the prices charged to businesses for credit card network services in Delaware.

300. Mastercard and the Bank Defendants' violations are willful.

301. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in Delaware and are entitled to all forms of relief, including recovery of treble damages.

**COUNT XV**
**VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,**
**D.C. CODE ANN. §§ 28-4501, et seq.**
**Visa and the Bank Defendants**

302. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

303. The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. CODE ANN. § 28-4501.

304. Members of the Class purchased credit card network services within the District of Columbia during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

305. Visa and the Bank Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, in violation of D.C. Code Ann. § 28-4502.

306. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT XVI**
**VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,**
**D.C. CODE ANN. §§ 28-4501, et seq.**
**Mastercard and the Bank Defendants**

307. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

308. The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District

of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. CODE ANN. § 28-4501.

309. Members of the Class purchased credit card network services within the District of Columbia during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

310. Mastercard and the Bank Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, in violation of D.C. Code Ann. § 28-4502.

311. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT XVII**
**VIOLATION OF HAWAII ANTITRUST ACT,**
**HAW. REV. STAT. §§ 480-4, *et seq*.**
**Visa and the Bank Defendants**

312. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

313. The Hawaii Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal." HAW. REV. STAT. § 480-4(a).

314. Members of the Class purchased credit card network services within Hawaii during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

315. Visa and the Bank Defendants contracted, combined or conspired to act in restraint of trade within Hawaii in violation of Haw. Rev. Stat. § 480-4(a).

316. Visa and the Bank Defendants' unlawful conduct substantially affected Hawaii's trade and commerce and Visa and the Bank Defendants' unlawful conduct occurred in substantial part in Hawaii by fixing the prices charged to businesses for credit card network services in Hawaii.

317. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in Hawaii and are entitled to all forms of relief, including recovery of treble damages.

**COUNT XVIII**
**VIOLATION OF HAWAII ANTITRUST ACT,**
**HAW. REV. STAT. §§ 480-4, *et seq*.**
**Mastercard and the Bank Defendants**

318. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

319. The Hawaii Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal." HAW. REV. STAT. § 480-4(a).

320. Members of the Class purchased credit card network services within Hawaii during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

321. Mastercard and the Bank Defendants contracted, combined or conspired to act in restraint of trade within Hawaii in violation of Haw. Rev. Stat. § 480-4(a).

322. Mastercard and the Bank Defendants' unlawful conduct substantially affected Hawaii's trade and commerce and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in Hawaii by fixing the prices charged to businesses for credit card network services in Hawaii.

323. Plaintiff and members of the Class were injured in their business or property with respect to purchases of credit card network services in Hawaii and are entitled to all forms of relief, including recovery of treble damages.

**COUNT XIX**
**VIOLATION OF ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/3(1), et seq.**
**Visa and the Bank Defendants**

324. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

325. The Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. Ann. 10/2.

326. Members of the Class purchased credit card network services within the State of Illinois during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

327. Visa and the Bank Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices in the Relevant Market within the State of Illinois, and unreasonably restrained trade or commerce, in violation of 740 Ill. Comp. Stat. Ann. 10/3(1) and 10/3(2).

328. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XX**
**VIOLATION OF ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/3(1), et seq.**
**Mastercard and the Bank Defendants**

329. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

330. The Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 Ill. Comp. Stat. Ann. 10/2.

331. Members of the Class purchased credit card network services within the State of Illinois during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

332. Mastercard and the Bank Defendants entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling or maintaining prices in the Relevant Market within the State of Illinois, and unreasonably restrained trade or commerce, in violation of 740 Ill. Comp. Stat. Ann. 10/3(1) and 10/3(2).

333. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT XXI**
**VIOLATION OF IOWA COMPETITION LAW,**
**IOWA CODE ANN. §§ 553.1, et seq.**
**Visa and the Bank Defendants**

334. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

335. The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." IOWA CODE ANN. § 553.2.

336. Members of the Class purchased credit card network services within the State of Iowa during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

337. Visa and the Bank Defendants contracted, combined or conspired to restrain trade in the Relevant Market in Iowa in violation of Iowa Code Ann. § 553.4.

338. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees, and costs.

**COUNT XXII**
**VIOLATION OF IOWA COMPETITION LAW,**
**IOWA CODE ANN. §§ 553.1, et seq.**
**Mastercard and the Bank Defendants**

339. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

340. The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." IOWA CODE ANN. § 553.2.

341. Members of the Class purchased credit card network services within the State of Iowa during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

342. Mastercard and the Bank Defendants contracted, combined or conspired to restrain trade in the Relevant Market in Iowa in violation of Iowa Code Ann. § 553.4.

343. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees, and costs.

**COUNT XXIII**
**VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. §§ 50-101, et seq.**
**Visa and the Bank Defendants**

344. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345. The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

346. Members of the Class purchased credit card network services within the State of Kansas during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

347. Visa and the Bank Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce in the Relevant Market, increasing the price of credit card network services, or preventing competition in the sale of credit card network services, in a manner that established the price of credit card network services and precluded free and unrestricted competition among themselves in the sale of credit card network services, in violation of Kan. Stat. Ann. Sections 50-101, *et seq*.

348. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees, and costs.

**COUNT XXIV**
**VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. §§ 50-101, et seq.**
**Mastercard and the Bank Defendants**

349. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

350. The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

351. Members of the Class purchased credit card network services within the State of Kansas during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

352. Mastercard and the Bank Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce in the Relevant Market, increasing the price of credit card network services, or preventing competition in the sale of credit card network services, in a manner that established the price of credit card network services and precluded free and unrestricted competition among themselves in the sale of credit card network services, in violation of Kan. Stat. Ann. Sections 50-101, *et seq*.

353. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees, and costs.

**COUNT XXV**
**VIOLATION OF MAINE'S MONOPOLIES AND PROFITEERING LAW, ME. STAT. TIT. 10, §§ 1101, et seq.**
**Visa and the Bank Defendants**

354. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

355. Part 3 of Title 10 of the Maine Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. *See* ME. STAT. tit. 10, §§ 1101-1102.

356. Members of the Class purchased credit card network services within the State of Maine during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

357. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maine in violation of Me. Stat. tit. 10, § 1101.

358. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT XXVI**
**VIOLATION OF MAINE'S MONOPOLIES AND PROFITEERING LAW, ME. STAT. TIT. 10, §§ 1101, et seq.**
**Mastercard and the Bank Defendants**

359. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

360. Part 3 of Title 10 of the Maine Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. *See* ME. STAT. tit. 10, §§ 1101-1102.

361. Members of the Class purchased credit card network services within the State of Maine during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

362. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maine in violation of Me. Stat. tit. 10, § 1101.

363. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT XXVII**
**VIOLATION OF MARYLAND'S ANTITRUST STATUTE,**
**MD. CODE ANN. COM. LAW §§ 11-201, et seq.**
**Visa and the Bank Defendants**

364. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

365. Maryland's antitrust statute makes it unlawful to, *inter alia*, "[b]y contract, combination, or conspiracy with one or more persons, unreasonably restrain trade or commerce." MD. CODE ANN. COM. LAW § 11-204(a)(1).

366. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. COM. LAW § 11-202(a)(1).

367. Members of the Class purchased credit card network services within the State of Maryland during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein,

the price of credit card network services would have been lower, in an amount to be determined at trial.

368. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maryland in violation of Md. Code Ann. Com. Law § 11-204(a)(1).

369. Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonable attorneys' fees. MD. CODE ANN. COM. LAW § 11-209(b)(4).

370. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT XXVIII**
**VIOLATION OF MARYLAND'S ANTITRUST STATUTE,**
**MD. CODE ANN. COM. LAW §§ 11-201, et seq.**
**Mastercard and the Bank Defendants**

371. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

372. Maryland's antitrust statute makes it unlawful to, *inter alia*, "[b]y contract, combination, or conspiracy with one or more persons, unreasonably restrain trade or commerce." MD. CODE ANN. COM. LAW § 11-204(a)(1).

373. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. COM. LAW § 11-202(a)(1).

374. Members of the Class purchased credit card network services within the State of Maryland during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

375. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Maryland in violation of Md. Code Ann. Com. Law § 11-204(a)(1).

376. Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonable attorneys' fees. MD. CODE ANN. COM. LAW § 11-209(b)(4).

377. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT XXIX**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS ANN. §§ 445.771, et seq.**
**Visa and the Bank Defendants**

378. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

379. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." 1984 Mich. Pub. Acts 274 (MICH. COMP. LAWS ANN. §§ 445.771, *et seq*.).

380. Members of the Class purchased credit card network services within the State of Michigan during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

381. Visa and the Bank Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the Relevant Market in violation of Mich. Comp. Laws Ann. § 445.772.

382. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, and reasonable attorneys' fees.

**COUNT XXX**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**MICH. COMP. LAWS ANN. §§ 445.771, et seq.**
**Mastercard and the Bank Defendants**

383. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

384. The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." 1984 Mich. Pub. Acts 274 (MICH. COMP. LAWS ANN. §§ 445.771, *et seq*.).

385. Members of the Class purchased credit card network services within the State of Michigan during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

386. Mastercard and the Bank Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the Relevant Market in violation of Mich. Comp. Laws Ann. § 445.772.

387. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, and reasonable attorneys' fees.

**COUNT XXXI**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. ANN. §§ 325D.49, et seq.**
**Visa and the Bank Defendants**

388. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

389. The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power; whenever any of the foregoing affects the trade or commerce of [Minnesota]." MINN. STAT. ANN. § 325D.54.

390. Members of the Class purchased credit card network services within the State of Minnesota during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

391. Visa and the Bank Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the Relevant Market, affecting the trade or commerce of Minnesota, in violation of Minn. Stat. Ann. §§ 325D.51 and 325D.53.

392. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, and reasonable attorneys' fees.

**COUNT XXXII**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. ANN. §§ 325D.49, et seq.**
**Mastercard and the Bank Defendants**

393. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

394. The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power; whenever any of the foregoing affects the trade or commerce of [Minnesota]." MINN. STAT. ANN. § 325D.54.

395. Members of the Class purchased credit card network services within the State of Minnesota during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

396. Mastercard and the Bank Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the Relevant Market, affecting the trade or commerce of Minnesota, in violation of Minn. Stat. Ann. §§ 325D.51 and 325D.53.

397. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, and reasonable attorneys' fees.

**COUNT XXXIII**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**MISS. CODE ANN. §§ 75-21-1, et seq.**
**Visa and the Bank Defendants**

398. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

399. Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

400. "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

401. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Mississippi.

402. Visa and the Bank Defendants sold credit card network services within Mississippi.

403. Members of the Class purchased credit card network services within the State of Mississippi during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

404. Visa and the Bank Defendants combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of credit card network services and hindering competition in the sale of credit card network services, in violation of Miss. Code Ann. Sections 75-21-1, *et seq*.

405. Credit card network services are sold to businesses throughout the State of Mississippi. During the Class Period, Visa and the Bank Defendants' illegal conduct substantially affected Mississippi commerce.

406. Visa and the Bank Defendants' unlawful conduct substantially affected Mississippi's trade and commerce, and Visa and the Bank Defendants' unlawful conduct occurred in substantial part in Mississippi by fixing the prices charged to businesses for credit card network services in Mississippi.

407. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**COUNT XXXIV**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**MISS. CODE ANN. §§ 75-21-1, et seq.**
**Mastercard and the Bank Defendants**

408. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

409. Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

410. "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

411. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Mississippi.

412. Mastercard and the Bank Defendants sold credit card network services within Mississippi.

413. Members of the Class purchased credit card network services within the State of Mississippi during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

414. Mastercard and the Bank Defendants combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of credit card network services and hindering competition in the sale of credit card network services, in violation of Miss. Code Ann. Sections 75-21-1, *et seq*.

415. Credit card network services are sold to businesses throughout the State of Mississippi. During the Class Period, Mastercard and the Bank Defendants' illegal conduct substantially affected Mississippi commerce.

416. Mastercard and the Bank Defendants' unlawful conduct substantially affected Mississippi's trade and commerce, and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in Mississippi by fixing the prices charged to businesses for credit card network services in Mississippi.

417. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**COUNT XXXV**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**NEB. REV. STAT. ANN. §§ 59-801, et seq.**
**Visa and the Bank Defendants**

418. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

419. Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

420. Members of the Class purchased credit card network services within the State of Nebraska during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

421. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nebraska in violation of Neb. Rev. Stat. Ann. Sections 59-801, *et seq*.

422. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, and costs.

**COUNT XXXVI**
**VIOLATION OF THE NEBRASKA JUNKIN ACT,**
**NEB. REV. STAT. ANN. §§ 59-801, et seq.**
**Mastercard and the Bank Defendants**

423. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

424. Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

425. Members of the Class purchased credit card network services within the State of Nebraska during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

426. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nebraska in violation of Neb. Rev. Stat. Ann. Sections 59-801, *et seq*.

427. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, and costs.

**COUNT XXXVII**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. ANN. §§ 598A.010, et seq.**
**Visa and the Bank Defendants**

428. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

429. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1)(a).

430. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive nature of our market system," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060(1)(a)-(c), (e).

431. Members of the Class purchased credit card network services within the State of Nevada during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein,

the price of credit card network services would have been lower, in an amount to be determined at trial.

432. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nevada in violation of Nev. Rev. Stat. Ann. § 598A.060.

433. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Nevada in that at least thousands of sales of credit card network services took place in Nevada, purchased by Nevada businesses at supracompetitive prices caused by Visa and the Bank Defendants' conduct.

434. Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

**COUNT XXXVIII**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**NEV. REV. STAT. ANN. §§ 598A.010, et seq.**
**Mastercard and the Bank Defendants**

435. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

436. The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1)(a).

437. The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive nature of our market system," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060(1)(a)-(c), (e).

438. Members of the Class purchased credit card network services within the State of Nevada during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth

herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

439. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of Nevada in violation of Nev. Rev. Stat. Ann. § 598A.060.

440. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Nevada in that at least thousands of sales of credit card network services took place in Nevada, purchased by Nevada businesses at supracompetitive prices caused by Mastercard and the Bank Defendants' conduct.

441. Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

**COUNT XXXIX**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. §§ 356:1, et seq.**
**Visa and the Bank Defendants**

442. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

443. Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

444. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. §§ 356:2-356:3.

445. Members of the Class purchased credit card network services within the State of New Hampshire during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

446. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Hampshire in violation of N.H. Rev. Stat. Ann. § 356:2.

447. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, and costs.

**COUNT XL**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. §§ 356:1, et seq.**
**Mastercard and the Bank Defendants**

448. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

449. Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

450. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. §§ 356:2-356:3.

451. Members of the Class purchased credit card network services within the State of New Hampshire during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

452. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Hampshire in violation of N.H. Rev. Stat. Ann. § 356:2.

453. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, and costs.

**COUNT XLI**
**VIOLATION OF THE NEW JERSEY ANTITRUST ACT,**
**N.J. STAT. ANN. §§ 56:9-1, et seq.**
**Visa and the Bank Defendants**

454. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

455. The New Jersey Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce [in the State]" or monopolies in the relevant market within the State. N.J. STAT. ANN. §§ 56:9-3 and 56:9-4.

456. Members of the Class purchased credit card network services within the State of New Jersey during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

457. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Jersey in violation of N.J. Stat. Ann. § 56:9-1, *et seq*.

458. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New Jersey and are entitled to all forms of relief under the New Jersey Antitrust Act.

**COUNT XLII**
**VIOLATION OF THE NEW JERSEY ANTITRUST ACT,**
**N.J. STAT. ANN. §§ 56:9-1, et seq.**
**Mastercard and the Bank Defendants**

459. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

460. The New Jersey Antitrust Act declares unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce [in the State]" or monopolies in the relevant market within the State. N.J. STAT. ANN. §§ 56:9-3 and 56:9-4.

461. Members of the Class purchased credit card network services within the State of New Jersey during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

462. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of New Jersey in violation of N.J. Stat. Ann. § 56:9-1, *et seq*.

463. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New Jersey and are entitled to all forms of relief under the New Jersey Antitrust Act.

**COUNT XLIII**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. §§ 57-1-1, et seq.**
**Visa and the Bank Defendants**

464. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

465. The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

466. Members of the Class purchased credit card network services within the State of New Mexico during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

467. Visa and the Bank Defendants contracted, agreed, combined, or conspired in restraint of trade in the Relevant Market within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. Sections 57-1-1, *et seq*.

468. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

**COUNT XLIV**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. §§ 57-1-1, et seq.**
**Mastercard and the Bank Defendants**

469. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

470. The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

471. Members of the Class purchased credit card network services within the State of New Mexico during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

472. Mastercard and the Bank Defendants contracted, agreed, combined, or conspired in restraint of trade in the Relevant Market within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. Sections 57-1-1, *et seq*.

473. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

**COUNT XLV**
**VIOLATION OF THE NEW YORK DONNELLY ACT,**
**N.Y. GEN. BUS. LAW §§ 340, et seq.**
**Visa and the Bank Defendants**

474. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

475. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

476. Members of the Class purchased credit card network services within the State of New York during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

477. Visa and the Bank Defendants restrained competition in the free exercise of the conduct of the business in the Relevant Market within the intrastate commerce of New York, in

violation of N.Y. Gen. Bus. Law Sections 340, *et seq*. Visa and the Bank Defendants' unlawful conduct substantially affected New York's trade and commerce, and Visa and the Bank Defendants' unlawful conduct occurred in substantial part in New York by fixing the prices charged to businesses for credit card network services in New York.

478. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. Gen. Bus. Law Section 340(5).

**COUNT XLVI**
**VIOLATION OF THE NEW YORK DONNELLY ACT,**
**N.Y. GEN. BUS. LAW §§ 340, et seq.**
**Mastercard and the Bank Defendants**

479. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

480. Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

481. Members of the Class purchased credit card network services within the State of New York during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

482. Mastercard and the Bank Defendants restrained competition in the free exercise of the conduct of the business in the Relevant Market within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law Sections 340, *et seq*. Mastercard and the Bank Defendants' unlawful conduct substantially affected New York's trade and commerce, and Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in New York by fixing the prices charged to businesses for credit card network services in New York.

483. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. Gen. Bus. Law Section 340(5).

**COUNT XLVII**
**VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,**
**N.C. GEN. STAT. ANN. §§ 75-1, et seq.**
**Visa and the Bank Defendants**

484. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

485. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

486. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina because Visa and the Bank Defendants' agreement fixed the prices charged to businesses in North Carolina for credit card network services, in violation of N.C. Gen. Stat. Ann. § 75-1.

487. Visa and the Bank Defendants' unlawful conduct substantially affected North Carolina's intrastate trade and commerce.

488. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

489. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. Ann. § 75-16.

**COUNT XLVIII**
**VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,**
**N.C. GEN. STAT. ANN. §§ 75-1, et seq.**
**Mastercard and the Bank Defendants**

490. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

491. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

492. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina because Mastercard and the Bank Defendants' agreement fixed the prices charged to businesses in North Carolina for credit card network services, in violation of N.C. Gen. Stat. Ann. § 75-1.

493. Mastercard and the Bank Defendants' unlawful conduct substantially affected North Carolina's intrastate trade and commerce.

494. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

495. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. Ann. § 75-16.

**COUNT XLIX**
**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE ANN. §§ 51-08.1-01, et seq.**
**Visa and the Bank Defendants**

496. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

497. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE ANN. §§ 51-08.1-01, *et seq*.

498. Members of the Class purchased credit card network services within the State of North Dakota during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

499. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Dakota.

500. Visa and the Bank Defendants' violations of North Dakota law were flagrant.

501. Visa and the Bank Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

502. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, and reasonable attorneys' fees.

**COUNT L**
**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT,**
**N.D. CENT. CODE ANN. §§ 51-08.1-01, et seq.**
**Mastercard and the Bank Defendants**

503. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

504. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE ANN. §§ 51-08.1-01, *et seq*.

505. Members of the Class purchased credit card network services within the State of North Dakota during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

506. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Dakota.

507. Mastercard and the Bank Defendants' violations of North Dakota law were flagrant.

508. Mastercard and the Bank Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

509. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, and reasonable attorneys' fees.

**COUNT LI**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. ANN. §§ 646.705, et seq.**
**Visa and the Bank Defendants**

510. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

511. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. ANN. § 646.715(1).

512. Members of the Class purchased credit card network services within the State of Oregon during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

513. Visa and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market in violation of Or. Rev. Stat. Ann. Sections 646.705, *et seq*. *See* OR. REV. STAT. ANN. §§ 646.725-646.730.

514. Plaintiff and members of the Class were injured with respect to purchases of credit card network services within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees, and investigative costs.

**COUNT LII**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. ANN. §§ 646.705, et seq.**
**Mastercard and the Bank Defendants**

515. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

516. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. ANN. § 646.715(1).

517. Members of the Class purchased credit card network services within the State of Oregon during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

518. Mastercard and the Bank Defendants contracted, combined, or conspired in restraint of trade or commerce in the Relevant Market in violation of Or. Rev. Stat. Ann. Sections 646.705, *et seq*. *See* OR. REV. STAT. ANN. §§ 646.725-646.730.

519. Plaintiff and members of the Class were injured with respect to purchases of credit card network services within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees, and investigative costs.

**COUNT LIII**
**VIOLATION OF THE PUERTO RICAN ANTI-MONOPOLY ACT,**
**P.R. LAWS ANN. TIT. 10, §§ 257, et seq.**
**Visa and the Bank Defendants**

520. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

521. The provisions of the Puerto Rican Anti-Monopoly Act of 1964 (the "AMA") parallel Sections 1 and 2 of the Sherman Act, and other federal statutes. Those provisions are supplemented by The Regulation on Fair Competition Number VII, which proscribes certain

conduct including the type engaged in by Visa and the Bank Defendants more fully described above.

522. Under the AMA, "[e]very contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce in the Commonwealth of Puerto Rico or in any section thereof, is hereby declared to be illegal." P.R. Laws Ann. tit. 10, § 258.

523. Members of the Class purchased credit card network services within Puerto Rico during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of those credit card network services would have been lower, in an amount to be determined at trial.

524. Visa and the Bank Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the Relevant Market in Puerto Rico, in violation of P.R. Laws Ann. tit. 10, § 258.

525. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Puerto Rico.

526. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, attorneys' fees, and costs of suit. P.R. LAWS ANN. tit. 10, § 268.

**COUNT LIV**
**VIOLATION OF THE PUERTO RICAN ANTI-MONOPOLY ACT,**
**P.R. LAWS ANN. TIT. 10, §§ 257, et seq.**
**Mastercard and the Bank Defendants**

527. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

528. The provisions of the Puerto Rican Anti-Monopoly Act of 1964 (the "AMA") parallel Sections 1 and 2 of the Sherman Act, and other federal statutes. Those provisions are supplemented by The Regulation on Fair Competition Number VII, which proscribes certain conduct including the type engaged in by Mastercard and the Bank Defendants more fully described above.

529. Under the AMA, "[e]very contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce in the Commonwealth of Puerto Rico or in any section thereof, is hereby declared to be illegal." P.R. Laws Ann. tit. 10, § 258.

530. Members of the Class purchased credit card network services within Puerto Rico during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of those credit card network services would have been lower, in an amount to be determined at trial.

531. Mastercard and the Bank Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the Relevant Market in Puerto Rico, in violation of P.R. Laws Ann. tit. 10, § 258.

532. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Puerto Rico.

533. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available, including treble damages, attorneys' fees, and costs of suit. P.R. LAWS ANN. tit. 10, § 268.

**COUNT LV**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**R.I. GEN. LAWS ANN. §§ 6-36-1, et seq.**
**Visa and the Bank Defendants**

534. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

535. The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. R.I. GEN. LAWS ANN. § 6-36-2(a)(2).

536. Members of the Class purchased credit card network services within the State of Rhode Island during the Class Period. But for Visa and the Bank Defendants' conduct set forth

herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

537. Visa and the Bank Defendants contracted, combined and conspired in restraint of trade in the Relevant Market within the intrastate commerce of Rhode Island in violation of R.I. GEN. LAWS ANN. §§ 6-36-1, *et seq*.

538. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, and reasonable attorneys' fees.

**COUNT LVI**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**R.I. GEN. LAWS ANN. §§ 6-36-1, et seq.**
**Mastercard and the Bank Defendants**

539. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

540. The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. R.I. GEN. LAWS ANN. § 6-36-2(a)(2).

541. Members of the Class purchased credit card network services within the State of Rhode Island during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

542. Mastercard and the Bank Defendants contracted, combined and conspired in restraint of trade in the Relevant Market within the intrastate commerce of Rhode Island in violation of R.I. GEN. LAWS ANN. §§ 6-36-1, *et seq*.

543. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, and reasonable attorneys' fees.

**COUNT LVII**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE, S.D. CODIFIED LAWS §§ 37-1-3.1, et seq.**
**Visa and the Bank Defendants**

544. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

545. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1 to 37-1-3.2.

546. Members of the Class purchased credit card network services within the State of South Dakota during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

547. Visa and the Bank Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of South Dakota in violation of S.D. Codified Laws §§ 37-1-3.1, *et seq*.

548. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, and reasonable attorneys' fees.

**COUNT LVIII**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE, S.D. CODIFIED LAWS §§ 37-1-3.1, et seq.**
**Mastercard and the Bank Defendants**

549. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

550. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1 to 37-1-3.2.

551. Members of the Class purchased credit card network services within the State of South Dakota during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

552. Mastercard and the Bank Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market within the intrastate commerce of South Dakota in violation of S.D. Codified Laws §§ 37-1-3.1, *et seq*.

553. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, and reasonable attorneys' fees.

**COUNT LIX**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE ANN. §§ 47-25-101, et seq.**
**Visa and the Bank Defendants**

554. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

555. The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

556. Visa and the Bank Defendants competed unfairly and colluded by meeting to fix prices and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

557. Visa and the Bank Defendants' conduct violated the Tennessee Trade Practices Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Visa and the Bank Defendants' combination or conspiracy had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for credit card network services were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the

Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for credit card network services.

558. During the Class Period, Visa and the Bank Defendants' illegal conduct had a substantial effect on Tennessee commerce as credit card network services were sold in Tennessee.

559. A substantial part of Visa and the Bank Defendants' illegal conduct occurred within Tennessee because Visa and the Bank Defendants' agreement fixed the retail prices of credit card network services in Tennessee.

560. Members of the Class purchased credit card network services within the State of Tennessee during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

561. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

562. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, and reasonable attorneys' fees.

**COUNT LX**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**TENN. CODE ANN. §§ 47-25-101, et seq.**
**Mastercard and the Bank Defendants**

563. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

564. The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations

between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

565. Mastercard and the Bank Defendants competed unfairly and colluded by meeting to fix prices and otherwise restrain trade as set forth herein, in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.

566. Mastercard and the Bank Defendants' conduct violated the Tennessee Trade Practices Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Mastercard and the Bank Defendants' combination or conspiracy had the following effects: (1) price competition in the Relevant Market was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for credit card network services were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for credit card network services.

567. During the Class Period, Mastercard and the Bank Defendants' illegal conduct had a substantial effect on Tennessee commerce as credit card network services were sold in Tennessee.

568. A substantial part of Mastercard and the Bank Defendants' illegal conduct occurred within Tennessee because Mastercard and the Bank Defendants' agreement fixed the retail prices of credit card network services in Tennessee.

569. Members of the Class purchased credit card network services within the State of Tennessee during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

570. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property and are threatened with further injury.

571. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, and reasonable attorneys' fees.

**COUNT LXI**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-16-501, et seq.**
**Visa and the Bank Defendants**

572. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

573. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-16-502(1)(b).

574. Members of the Class purchased credit card network services within the State of Utah during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

575. Visa and the Bank Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market in violation of Utah Code Ann. §§ 76-16-501, *et seq*.

576. Members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of credit card network services in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

**COUNT LXII**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-16-501, et seq.**
**Mastercard and the Bank Defendants**

577. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

578. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-16-502(1)(b).

579. Members of the Class purchased credit card network services within the State of Utah during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

580. Mastercard and the Bank Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market in violation of Utah Code Ann. §§ 76-16-501, *et seq*.

581. Members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of credit card network services in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

**COUNT LXIII**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE ANN. §§ 47-18-1, et seq.**
**Visa and the Bank Defendants**

582. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

583. The violations of law set forth above also constitute violations of Section 47-18-3 of the West Virginia Code.

584. During the Class Period, Visa and the Bank Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia in violation of W. Va. Code Sections 47-18-3 to 47-18-4.

585. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within West Virginia.

586. Members of the Class purchased credit card network services within the State of West Virginia during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

587. Visa and the Bank Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

588. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property in that they paid more for credit card network services than they otherwise would have paid in the absence of Visa and the Bank Defendants' unlawful conduct.

589. Plaintiff and members of the Class have standing to pursue their claims under, *inter alia*, W. Va. Code Section 47-18-9.

590. As a result of Visa and the Bank Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiff and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**COUNT LXIV**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE ANN. §§ 47-18-1, et seq.**
**Mastercard and the Bank Defendants**

591. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

592. The violations of law set forth above also constitute violations of Section 47-18-3 of the West Virginia Code.

593. During the Class Period, Mastercard and the Bank Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia in violation of W. Va. Code Sections 47-18-3 to 47-18-4.

594. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within West Virginia.

595. Members of the Class purchased credit card network services within the State of West Virginia during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

596. Mastercard and the Bank Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

597. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property in that they paid more for credit card network services than they otherwise would have paid in the absence of Mastercard and the Bank Defendants' unlawful conduct.

598. Plaintiff and members of the Class have standing to pursue their claims under, *inter alia*, W. Va. Code Section 47-18-9.

599. As a result of Mastercard and the Bank Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiff and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**COUNT LXV**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**WIS. STAT. ANN. §§ 133.01, et seq.**
**Visa and the Bank Defendants**

600. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

601. Chapter 133 of the Wisconsin Statutes governs trusts and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and

encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. Ann. § 133.01.

602. Members of the Class purchased credit card network services within the State of Wisconsin during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

603. Visa and the Bank Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

604. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of businesses in Wisconsin paying substantially higher prices for credit card network services in Wisconsin.

605. Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs, and reasonable attorneys' fees.

**COUNT LXVI**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**WIS. STAT. ANN. §§ 133.01, et seq.**
**Mastercard and the Bank Defendants**

606. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

607. Chapter 133 of the Wisconsin Statutes governs trusts and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. Ann. § 133.01.

608. Members of the Class purchased credit card network services within the State of Wisconsin during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth

herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

609. Mastercard and the Bank Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. Ann. §§ 133.01, *et seq*.

610. Plaintiff and members of the Class were injured with respect to purchases of credit card network services in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of businesses in Wisconsin paying substantially higher prices for credit card network services in Wisconsin.

611. Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs, and reasonable attorneys' fees.

**VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**

612. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

613. Defendants' above-described scheme and conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiff and the Class paid higher prices for credit card network services than they should have.

614. The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

615. There was and is a gross disparity between the price that Plaintiff and the Class members paid for credit card network services and the value they received.

616. The following Sixty-Seventh through Eighty-Fourth Counts are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of Plaintiff and members of the Class.

**COUNT LXVII**
**VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT,**
**ARK. CODE ANN. §§ 4-88-101, et seq.**
**Visa and the Bank Defendants**

617. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

618. The Arkansas Deceptive Trade Practices Act (the "ADTPA") forbids certain enumerated "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a).

619. Members of the Class purchased credit card network services within the State of Arkansas during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

620. Visa and the Bank Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arkansas.

621. The aforementioned conduct by Visa and the Bank Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

622. Visa and the Bank Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.

623. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property by being forced to pay more for credit card network services than they otherwise would have paid in the absence of Visa and the Bank Defendants' unlawful conduct.

624. Accordingly, Plaintiff and members of the Class are entitled to seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

**COUNT LXVIII**

**VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT,**
**ARK. CODE ANN. §§ 4-88-101, et seq.**
**Mastercard and the Bank Defendants**

625. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

626. The Arkansas Deceptive Trade Practices Act (the "ADTPA") forbids certain enumerated "[d]eceptive and unconscionable trade practices," as well as "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a).

627. Members of the Class purchased credit card network services within the State of Arkansas during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

628. Mastercard and the Bank Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Arkansas.

629. The aforementioned conduct by Mastercard and the Bank Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

630. Mastercard and the Bank Defendants' unlawful conduct substantially affected Arkansas's trade and commerce.

631. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property by being forced to pay more for credit card network services than they otherwise would have paid in the absence of Mastercard and the Bank Defendants' unlawful conduct.

632. Accordingly, Plaintiff and members of the Class are entitled to seek all forms of relief available under Ark. Code Ann. § 4-88-113(f).

**COUNT LXIX**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**

**FLA. STAT. ANN. §§ 501.201, et seq.**
**Visa and the Bank Defendants**

633. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

634. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Fla. Stat. Ann. § 501.204(1).

635. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.202(2).

636. Members of the Class purchased credit card network services within the State of Florida during the Class Period. But for Visa and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

637. Visa and the Bank Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Florida.

638. Accordingly, Visa and the Bank Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

639. Visa and the Bank Defendants' unlawful conduct substantially affected Florida's trade and commerce.

640. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property by virtue of being forced to pay overcharges on credit card network services. Because Visa and the

Bank Defendants' anticompetitive agreement to fix the price of credit card network services is ongoing and because members of the Class buy credit card network services on a regular basis, there is a high probability that members of the Class will suffer injury in the future as a result of Visa and the Bank Defendants' conduct.

641. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available pursuant to Fla. Stat. Ann. § 501.211.

**COUNT LXX**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. ANN. §§ 501.201, et seq.**
**Mastercard and the Bank Defendants**

642. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

643. The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq*. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Fla. Stat. Ann. § 501.204(1).

644. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.202(2).

645. Members of the Class purchased credit card network services within the State of Florida during the Class Period. But for Mastercard and the Bank Defendants' conduct set forth herein, the price of credit card network services would have been lower, in an amount to be determined at trial.

646. Mastercard and the Bank Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Florida.

647. Accordingly, Mastercard and the Bank Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

648. Mastercard and the Bank Defendants' unlawful conduct substantially affected Florida's trade and commerce.

649. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property by virtue of being forced to pay overcharges on credit card network services. Because Mastercard and the Bank Defendants' anticompetitive agreement to fix the price of credit card network services is ongoing and because members of the Class buy credit card network services on a regular basis, there is a high probability that members of the Class will suffer injury in the future as a result of Mastercard and the Bank Defendants' conduct.

650. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available pursuant to Fla. Stat. Ann. § 501.211.

**COUNT LXXI**
**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT,**
**IDAHO CODE ANN. §§ 48-601, et seq.**
**Visa and the Bank Defendants**

651. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

652. The Idaho Consumer Protection Act (the "ICPA") prohibits "unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce," IDAHO CODE ANN. § 48-601, which includes, among other things, "any unconscionable method, act or practice in the conduct of any trade or commerce." IDAHO CODE ANN. § 48-603C(1).

653. Visa and the Bank Defendants' anticompetitive efforts, which are described above, constituted an unfair method of competition, or an unconscionable practice, under the ICPA.

654. Visa and the Bank Defendants intentionally engaged in the above conduct in order to reduce competition in the Relevant Market.

655. Visa and the Bank Defendants' alleged conduct would outrage or offend the public conscience.

656. During the Class Period, members of the Class purchased credit card network services in Idaho.

657. Visa and the Bank Defendants' conduct was the proximate cause of injuries to members of the Class, namely in the form of overcharges for credit card network services.

658. Because credit card network services are purchased on an ongoing basis, there is a high probability that members of the Class will suffer injury in the future, as a result of Visa and the Bank Defendants' conduct.

659. In light of the above, members of the Class are entitled to seek actual damages, along with any other form of relief that the Court deems proper under the ICPA, including statutory damages, punitive damages, attorneys' fees, costs, etc. *See* IDAHO CODE ANN. § 48-608.

**COUNT LXXII**
**VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT,**
**IDAHO CODE ANN. §§ 48-601, et seq.**
**Mastercard and the Bank Defendants**

660. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

661. The Idaho Consumer Protection Act (the "ICPA") prohibits "unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce," IDAHO CODE ANN. § 48-601, which includes, among other things, "any unconscionable method, act or practice in the conduct of any trade or commerce." IDAHO CODE ANN. § 48-603C(1).

662. Mastercard and the Bank Defendants' anticompetitive efforts, which are described above, constituted an unfair method of competition, or an unconscionable practice, under the ICPA.

663. Mastercard and the Bank Defendants intentionally engaged in the above conduct in order to reduce competition in the Relevant Market.

664. Mastercard and the Bank Defendants' alleged conduct would outrage or offend the public conscience.

665. During the Class Period, members of the Class purchased credit card network services in Idaho.

666. Mastercard and the Bank Defendants' conduct was the proximate cause of injuries to members of the Class, namely in the form of overcharges for credit card network services.

667. Because credit card network services are purchased on an ongoing basis, there is a high probability that members of the Class will suffer injury in the future, as a result of Mastercard and the Bank Defendants' conduct.

668. In light of the above, members of the Class are entitled to seek actual damages, along with any other form of relief that the Court deems proper under the ICPA, including statutory damages, punitive damages, attorneys' fees, costs, etc. *See* IDAHO CODE ANN. § 48-608.

**COUNT LXXIII**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. ANN. §§ 59-1602, et seq.**
**Visa and the Bank Defendants**

669. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

670. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated NEB. REV. STAT. ANN. §§ 59-1602, *et seq*.

671. Visa and the Bank Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nebraska.

672. Visa and the Bank Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

673. Visa and the Bank Defendants' conduct affects the public interest of the State of Nebraska, because it inflates the fees paid on credit card transactions by businesses throughout Nebraska and has been repeated throughout the Class Period.

674. Visa and the Bank Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

675. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

676. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. Ann. § 59-1614.

**COUNT LXXIV**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. ANN. §§ 59-1602, et seq.**
**Mastercard and the Bank Defendants**

677. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

678. By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated NEB. REV. STAT. ANN. §§ 59-1602, *et seq*.

679. Mastercard and the Bank Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nebraska.

680. Mastercard and the Bank Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

681. Mastercard and the Bank Defendants' conduct affects the public interest of the State of Nebraska, because it inflates the fees paid on credit card transactions by businesses throughout Nebraska and has been repeated throughout the Class Period.

682. Mastercard and the Bank Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

683. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

684. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Neb. Rev. Stat. Ann. § 59-1614.

**COUNT LXXV**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. ANN. §§ 598.0903, et seq.**
**Visa and the Bank Defendants**

685. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

686. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated NEV. REV. STAT. ANN. §§ 598.0903, *et seq*.

687. Visa and the Bank Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

688. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nevada.

689. Visa and the Bank Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

690. Visa and the Bank Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

691. Visa and the Bank Defendants' conduct was willful.

692. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

693. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Nev. Rev. Stat. Ann. § 41.600, including damages and reasonable attorneys' fees and costs.

**COUNT LXXVI**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. ANN. §§ 598.0903, et seq.**
**Mastercard and the Bank Defendants**

694. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

695. By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated NEV. REV. STAT. ANN. §§ 598.0903, *et seq*.

696. Mastercard and the Bank Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

697. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within Nevada.

698. Mastercard and the Bank Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

699. Mastercard and the Bank Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

700. Mastercard and the Bank Defendants' conduct was willful.

701. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

702. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under Nev. Rev. Stat. Ann. § 41.600, including damages and reasonable attorneys' fees and costs.

**COUNT LXXVII**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. §§ 358-A:1, et seq.**
**Visa and the Bank Defendants**

703. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

704. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.

705. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Hampshire. Visa and the Bank Defendants' unlawful conduct occurred in substantial part in New Hampshire by fixing the prices charged to businesses for credit card network services in New Hampshire.

706. Visa and the Bank Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

707. Visa and the Bank Defendants' conduct was willful and knowing.

708. Visa and the Bank Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

709. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

710. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. §§ 358-A:10, 358-A:10-a.

**COUNT LXXVIII**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. §§ 358-A:1, et seq.**
**Mastercard and the Bank Defendants**

711. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

712. By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.

713. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Hampshire. Mastercard and the Bank Defendants' unlawful conduct occurred in substantial part in New Hampshire by fixing the prices charged to businesses for credit card network services in New Hampshire.

714. Mastercard and the Bank Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

715. Mastercard and the Bank Defendants' conduct was willful and knowing.

716. Mastercard and the Bank Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

717. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

718. By reason of the foregoing, members of the Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. §§ 358-A:10, 358-A:10-a.

**COUNT LXXIX**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-1, et seq.**
**Visa and the Bank Defendants**

719. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

720. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

721. Visa and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Mexico.

722. Visa and the Bank Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

723. Visa and the Bank Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

724. Visa and the Bank Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received

by Class members and the price paid by them for credit card network services as set forth in N.M. Stat. Ann. § 57-12-2(E).

725. Visa and the Bank Defendants' conduct was willful.

726. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

727. By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. § 57-12-10.

**COUNT LXXX**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-1, et seq.**
**Mastercard and the Bank Defendants**

728. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

*729.* By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

730. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within New Mexico.

731. Mastercard and the Bank Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

732. Mastercard and the Bank Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

733. Mastercard and the Bank Defendants' conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Class members and the price paid by them for credit card network services as set forth in N.M. Stat. Ann. § 57-12-2(E).

734. Mastercard and the Bank Defendants' conduct was willful.

735. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

736. By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. § 57-12-10.

**COUNT LXXXI**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. ANN. §§ 75-1.1, et seq.**
**Visa and the Bank Defendants**

737. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

738. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated N.C. GEN. STAT. ANN. §§ 75-1.1, *et seq*.

739. Visa and the Bank Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina.

740. Visa and the Bank Defendants' conduct offends public policy and constitutes unfair methods of competition and unfair acts or practices in or affecting commerce within the meaning of N.C. Gen. Stat. Ann. § 75-1.1(a).

741. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

742. By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. Ann. § 75-16.

**COUNT LXXXII**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. ANN. §§ 75-1.1, et seq.**
**Mastercard and the Bank Defendants**

743. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

744. By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated N.C. GEN. STAT. ANN. §§ 75-1.1, *et seq*.

745. Mastercard and the Bank Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within North Carolina.

746. Mastercard and the Bank Defendants' conduct offends public policy and constitutes unfair methods of competition and unfair acts or practices in or affecting commerce within the meaning of N.C. Gen. Stat. Ann. § 75-1.1(a).

747. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property and are threatened with further injury.

748. By reason of the foregoing, members of the Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. Ann. § 75-16.

**COUNT LXXXIII**
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §§ 39-5-10, et seq.**
**Visa and the Bank Defendants**

749. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

750. By reason of the conduct alleged herein, Visa and the Bank Defendants have violated S.C. CODE ANN. §§ 39-5-10, *et seq*.

751. Visa and the Bank Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within South Carolina.

752. Visa and the Bank Defendants' conduct constitutes unfair methods of competition and unfair acts or practices in the conduct of trade or commerce within the meaning of S.C. Code

Ann. § 39-5-20(a), including trade or commerce directly or indirectly affecting the people of South Carolina.

753. Visa and the Bank Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

754. Visa and the Bank Defendants' unlawful conduct adversely affects the public interest of the State of South Carolina. The conduct has been repeated throughout the Class Period and will continue absent relief.

755. Visa and the Bank Defendants' violations of S.C. Code Ann. § 39-5-20 were willful and knowing: Visa and the Bank Defendants knew or should have known that their conduct violated the Act.

756. As a direct and proximate result of Visa and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have suffered an ascertainable loss of money or property, including supracompetitive interchange and network fees paid on Visa credit card transactions in South Carolina, and are threatened with further injury.

757. By reason of the foregoing, Plaintiff and members of the Class are entitled to seek all forms of relief available under S.C. Code Ann. § 39-5-140, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT LXXXIV**
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT,**
**S.C. CODE ANN. §§ 39-5-10, et seq.**
**Mastercard and the Bank Defendants**

758. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

759. By reason of the conduct alleged herein, Mastercard and the Bank Defendants have violated S.C. CODE ANN. §§ 39-5-10, *et seq*.

760. Mastercard and the Bank Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Market, a substantial part of which occurred within South Carolina.

761. Mastercard and the Bank Defendants' conduct constitutes unfair methods of competition and unfair acts or practices in the conduct of trade or commerce within the meaning of S.C. Code Ann. § 39-5-20(a), including trade or commerce directly or indirectly affecting the people of South Carolina.

762. Mastercard and the Bank Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

763. Mastercard and the Bank Defendants' unlawful conduct adversely affects the public interest of the State of South Carolina. The conduct has been repeated throughout the Class Period and will continue absent relief.

764. Mastercard and the Bank Defendants' violations of S.C. Code Ann. § 39-5-20 were willful and knowing: Mastercard and the Bank Defendants knew or should have known that their conduct violated the Act.

765. As a direct and proximate result of Mastercard and the Bank Defendants' unlawful conduct, Plaintiff and members of the Class have suffered an ascertainable loss of money or property, including supracompetitive interchange and network fees paid on Mastercard credit card transactions in South Carolina, and are threatened with further injury.

766. By reason of the foregoing, Plaintiff and members of the Class are entitled to seek all forms of relief available under S.C. Code Ann. § 39-5-140, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## X. PETITION FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully asks the Court for a judgment that:

1. Certifies the Class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) and directs that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class;

2. Appoints Plaintiff and its attorneys as class representatives and class counsel, respectively;

3. Enters judgment against Defendants, and in favor of Plaintiff and the Class, holding

Defendants liable for the antitrust violations alleged;

4. Adjudges and decrees that Defendants acted unlawfully to contract or conspire to restrain trade in the Relevant Market in violation of the Sherman Act, 15 U.S.C. §§ 1, 3;

5. Enters such relief as needed to cure the anticompetitive harm from all of Defendants' unlawful actions;

6. Awards Plaintiff and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with law;

7. Awards Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

8. Directs such further relief as it may deem just and proper.

Dated: September 30, 2026

Respectfully submitted,

/s/ *Christopher Bateman*
Christopher Bateman
Daniel Gifford
**COHEN MILSTEIN SELLERS & TOLL LLP**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
cbateman@cohenmilstein.com
dgifford@cohenmilstein.com

Brent W. Johnson
Daniel McCuaig
**COHEN MILSTEIN SELLERS & TOLL LLP**
1100 New York Ave. NW, Eighth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
bjohnson@cohenmilstein.com
dmccuaig@cohenmilstein.com

Christopher L. Lebsock
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 633-4980
clebsock@hausfeld.com

Daniel P. Weick
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
dweick@hausfeld.com

*Counsel for Plaintiff and Proposed Co-Lead Counsel for the Class*

Christopher J. Cormier
**BURNS CHAREST LLP**
2445 M Street NW, Suite 740
Washington, DC 20037
Tel: (202) 577-3977
ccormier@burnscharest.com

Matthew Tripolitsiotis
**BURNS CHAREST LLP**
757 Third Ave., 20th Floor
New York, NY 10017
Tel: (469) 895-5269
mtripolitsiotis@burnscharest.com

*Additional Counsel for Plaintiff and the Proposed Class*